Licci v. Lebanese Canadian Bank, SAL

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2010

(Argued:  February 25, 2011          Decided: March 5, 2012)

Docket No. 10-1306-cv

------------------------------------

YAAKOV LICCI, a minor, by his father and natural guardian, ELIHAV LICCI, and by his mother and natural guardian, YEHUDIT LICCI, et al.,

Plaintiffs-Appellants,

- v -

LEBANESE CANADIAN BANK, SAL; AMERICAN EXPRESS BANK LTD.,

Defendants-Appellees.[*]

------------------------------------

Before:    KEARSE, SACK, and KATZMANN, Circuit Judges.

Appeal from a judgment of the United States District Court for the Southern District of New York (George B. Daniels, Judge) granting the motion to dismiss filed by defendants-appellees American Express Bank Ltd. ("AmEx").  The plaintiffs, all Israeli residents, were allegedly injured, or their family members killed or injured, by rockets fired by Hizballah, a Lebanese terrorist organization, into northern Israel in July

---

[*] The Clerk of Court is directed to amend the official caption as shown above.

and August 2006.  The district court dismissed the plaintiffs' negligence claim against AmEx, evaluating the claim under New York state law.  Because we conclude that New York law would apply even if a conflict between the laws of the relevant jurisdictions existed, and that the plaintiffs do not have a viable claim against AmEx under New York law, the judgment of the district court insofar as it is in favor of AmEx is hereby AFFIRMED.

The district court's dismissal of a separate claim against Lebanese Canadian Bank SAL is considered in a separate opinion filed today.

Appearances:                    ROBERT J. TOLCHIN, Jaroslawicz & Jaros, New York, NY, for Plaintiffs-Appellants.

JONATHAN D. SIEGFRIED (Lawrence S. Hirsh, on the brief), Dewey & LeBoeuf LLP, New York, NY, for Defendant-Appellee Lebanese Canadian Bank, SAL.

MARK P. LADNER (Mark David McPherson, Michael Gerard, on the brief), Morrison & Foerster LLP, New York, NY, for Defendant-Appellee American Express Bank Ltd.

PER CURIAM:

The plaintiffs-appellants, Yaakov Licci et al., appeal from a March 31, 2010, decision and order of the United States District Court for the Southern District of New York (George B. Daniels, Judge) granting the motions to dismiss

2

filed by defendants-appellees Lebanese Canadian Bank, SAL ("LCB") and American Express Bank Ltd. ("AmEx").

This opinion addresses only the plaintiffs' negligence claim against AmEx.  The plaintiffs' claims against LCB are addressed in an accompanying opinion.  See Licci v. Lebanese Canadian Bank, SAL, __ F.3d __ (2d Cir. March 5, 2012).  A full account of the underlying facts is set forth in that opinion.

This case concerns a series of rocket attacks launched by Hizballah, a Lebanese terrorist organization, at targets in northern Israel in July and August 2006.  The plaintiffs are American, Canadian, and Israeli civilians who were injured, or whose family members were injured or killed, during the rocket attacks.  They allege that LCB knowingly maintained bank accounts for an alleged Hizballah affiliate, the Shahid (Martyrs) Foundation ("Shahid"), and carried out dozens of international wire transfers on Shahid's behalf. These wire transfers, which totaled several million dollars, were conducted using LCB's correspondent bank account at AmEx in New York.  The plaintiffs assert that AmEx, by facilitating these wire transfers on behalf of LCB and Shahid, breached a legal duty of care to the plaintiffs and thereby caused the plaintiffs' injuries.

"We review the district court's grant of a Rule 12(b)(6) motion to dismiss de novo, accepting all factual claims in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." Famous Horse Inc. v. 5th Ave. Photo Inc., 624 F.3d 106, 108 (2d Cir. 2010). In so doing, we ascertain whether the complaint "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (internal quotation marks omitted). "Because our review is de novo, we are free to affirm the decision below on dispositive but different grounds." Chase Grp. Alliance LLC v. City of N.Y. Dep't of Fin., 620 F.3d 146, 150 (2d Cir. 2010) (internal quotation marks omitted).

This case presents a threshold question of choice of law. Plaintiffs assert that Israeli law governs their negligence claim, while AmEx maintains that New York law governs. "We review the district court's choice of law de novo." Finance One Pub. Co. v. Lehman Bros. Special Fin., Inc., 414 F.3d 325, 331 (2d Cir. 2005), cert. denied, 548 U.S. 904 (2006).

"A federal court sitting in diversity or adjudicating state law claims that are pendent to a federal claim must apply the choice of law rules of the forum state." Rogers v.

4

*Grimaldi*, 875 F.2d 994, 1002 (2d Cir. 1989). Accordingly, New York choice-of-law rules apply in adjudicating the plaintiffs' negligence claim.

Under New York choice-of-law rules, "'[t]he first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved.'" *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 415 (2d Cir. 2006) (quoting *In re Allstate Ins. Co.*, 81 N.Y.2d 219, 223, 597 N.Y.S.2d 904, 905, 613 N.E.2d 936, 937 (1993)). A choice-of-law analysis need not be performed unless there is "an 'actual conflict' between the applicable rules of two relevant jurisdictions." *Finance One*, 414 F.3d at 331. If no actual conflict exists, and if New York is among the relevant jurisdictions, the court may simply apply New York law. *See Wall*, 471 F.3d at 422; *Int'l Bus. Machs. Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir. 2004).

The district court determined that "no actual conflict exists between the applicable substantive law of negligence in New York and Israel." *Licci v. Am. Express Bank Ltd.*, 704 F. Supp. 2d 403, 409 (S.D.N.Y. 2010). It therefore proceeded to evaluate the plaintiffs' negligence claim against AmEx under New York state law. *Id.* at 410. The district court observed that under New York law, "[b]anks do not owe non-

5

customers a duty to protect them from the intentional torts committed by [the banks'] customers." Id. (citing Lerner v. Fleet Bank, N.A., 459 F.3d 273, 286 (2d Cir. 2006)). The district court also determined that the plaintiffs had failed plausibly to allege that AmEx's conduct was the proximate cause of the plaintiffs' injuries. Id. at 410-11. For those reasons, the district court dismissed the plaintiffs' negligence claim against AmEx.

On appeal, the plaintiffs contend that there is an actual conflict between Israeli law and New York law, and therefore the district court erred in declining to conduct a choice-of-law analysis. The plaintiffs further argue that Israeli law, not New York law, governs their negligence claim against AmEx.

We use New York conflict of laws principles to determine whether New York or Israeli law governs. See Rogers, 875 F.2d at 1002. Even if the plaintiffs are correct and an actual conflict exists between the relevant substantive laws of New York and Israel, New York conflicts law directs that "'[t]he law of the jurisdiction having the greatest interest in the litigation will be applied.'" GlobalNet Financial.Com, Inc. v. Frank Crystal & Co., 449 F.3d 377, 384 (2d Cir. 2006) (quoting Schultz v. Boy Scouts of Am., Inc., 65 N.Y.2d 189, 197, 491 N.Y.S.2d 90, 95, 480 N.E.2d 679, 684 (1985)).

"Interest analysis is a 'flexible approach intended to give controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation.'"  Finance One, 414 F.3d at 337 (quoting Cooney v. Osgood Mach., Inc., 81 N.Y.2d 66, 72, 595 N.Y.S.2d 919, 922, 612 N.E.2d 277, 280 (1993)).

In tort-law disputes, interest analysis distinguishes between two sets of rules: conduct-regulating rules and loss-allocating rules.  GlobalNet, 449 F.3d at 384.  Conduct-regulating rules are those that "people use as a guide to governing their primary conduct," K.T. v. Dash, 37 A.D.3d 107, 112, 827 N.Y.S.2d 112, 117 (1st Dep't 2006), while "[l]oss allocating rules . . . are laws that prohibit, assign, or limit liability after the tort occurs," DeMasi v. Rogers, 34 A.D.3d 720, 721, 826 N.Y.S.2d 106, 108 (2d Dep't 2006) (internal quotation marks omitted).

The alleged conflict in this case concerns a conduct-regulating rule: the scope of a bank's duty to protect third parties against intentional torts committed by the bank's customers.  "'If conflicting conduct-regulating laws are at issue, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders.'"

7

GlobalNet, 449 F.3d at 384 (quoting Cooney, 81 N.Y.2d at 72, 595 N.Y.S.2d at 922, 612 N.E.2d at 280).

Applying the interest-analysis test, we conclude that New York has the greatest interest in this litigation. All of the challenged conduct undertaken by AmEx occurred in New York, where AmEx is headquartered and where AmEx administers its correspondent banking services. Although the plaintiffs' injuries occurred in Israel, and Israel is also the plaintiffs' domicile, those factors do not govern where, as here, the conflict pertains to a conduct-regulating rule. Cf. GlobalNet, 449 F.3d at 384-85. We conclude that New York, not Israel, has the stronger interest in regulating the conduct of New York-based banks operating in New York. See, e.g., Schultz, 65 N.Y.2d at 198, 491 N.Y.S.2d at 96, 480 N.E.2d at 684-85 (noting the "locus jurisdiction's interests in protecting the reasonable expectations of the parties who relied on it to govern their primary conduct").

Accordingly, even assuming that the district court was mistaken in deciding that there was no actual conflict between New York law and Israeli law, we conclude that a choice-of-law analysis would nonetheless require application of New York law to the plaintiffs' negligence claim against AmEx. The plaintiffs do not dispute that that claim must fail if New York law is applied. The district court therefore did not err

8

in dismissing the plaintiffs' negligence claim against AmEx, and we affirm on that ground.

For the foregoing reasons, the judgment of the district court insofar as it is in favor of AmEx is affirmed.

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2010

(Argued: February 25, 2011          Decided: March 5, 2012)

Docket No. 10-1306-cv

-------------------------------------

YAAKOV LICCI, a minor, by his father and natural guardian,
ELIHAV LICCI, and by his mother and natural guardian, YEHUDIT
LICCI, et al.,

Plaintiffs-Appellants,

- v -

LEBANESE CANADIAN BANK, SAL; AMERICAN EXPRESS BANK LTD.,

Defendants-Appellees.[*]

-------------------------------------

Before:   KEARSE, SACK, and KATZMANN, Circuit Judges.

Appeal from a judgment of the United States District Court for the Southern District of New York (George B. Daniels, Judge) dismissing the plaintiffs' complaint against defendant Lebanese Canadian Bank, SAL, for lack of personal jurisdiction. The plaintiffs, all Israeli residents, were allegedly injured, or their family members killed or injured, by rockets fired by

_____

[*] The Clerk of Court is directed to amend the caption as set forth above.

Hizballah, a Lebanese terrorist organization, into northern Israel in July and August 2006. The district court concluded that the bank's use of its New York account was not enough to permit the exercise of personal jurisdiction over it under the New York long-arm statute, New York Civil Practice Law and Rules § 302(a)(1). Because we are of the view that there is insufficient New York State authority on the issue for us to determine with confidence whether the district court's conclusion was correct, we seek the views of the New York Court of Appeals as to whether the plaintiffs' claims "aris[e] from" a "transact[ion] [of] business" in New York within the meaning of N.Y. C.P.L.R. § 302(a)(1).

The district court's dismissal of a separate claim against American Express Bank Ltd. is affirmed by separate opinion filed today.

Questions certified.

| Appearances: | ROBERT J. TOLCHIN, Jaroslawicz & Jaros, New York, NY, for Plaintiffs-Appellants. |
|---|---|
| | JONATHAN D. SIEGFRIED (Lawrence S. Hirsh, on the brief), Dewey & LeBoeuf LLP, New York, NY, for Defendant-Appellee Lebanese Canadian Bank, SAL. |
| | MARK P. LADNER (Mark David McPherson, Michael Gerard, on the brief), Morrison & Foerster LLP, New York, NY, for Defendant-Appellee American Express Bank Ltd. |

2

SACK, Circuit Judge:

This appeal presents the question whether a foreign bank's maintenance and use of a correspondent banking account in New York to conduct wire transfers on behalf of a foreign client renders it amenable to personal jurisdiction in New York under the state's long-arm statute to defend against claims asserted by victims of terrorist attacks committed abroad. The plaintiffs are several dozen American, Canadian, and Israeli citizens, all of whom reside in Israel, who were injured, or whose family members were killed or injured, in rocket attacks allegedly committed by Hizballah, designated as an Islamic terrorist organization,[1] in July and August 2006. The plaintiffs have brought suit against Lebanese Canadian Bank, SAL ("LCB"),[2] a Lebanese bank headquartered in Beirut, alleging

---

[1] "Hizballah (Party of God)" has been designated by the United States Department of State as a "Foreign Terrorist Organization" pursuant to 8 U.S.C. § 1189(a). See U.S. Dep't of State, Office of Coordinator for Counterterrorism, Foreign Terrorist Organizations (Jan. 27, 2012), http://www.state.gov/j/ct/rls/other/des/123085.htm. We use the State Department's spelling throughout this opinion unless quoting directly from a source that uses different spelling.

[2] The amended complaint also contains a single claim for negligence against defendant American Express Bank ("AmEx") under Israeli law. This claim is pleaded on behalf of all plaintiffs. The district court, applying New York law, dismissed that claim against AmEx on the basis that there was no actual conflict between Israeli and New York law, and that under New York law, "[b]anks do not owe non-customers a duty to protect them from the intentional torts committed by [the banks'] customers." Licci v. Am. Express Bank Ltd., 704 F. Supp. 2d 403, 410 (S.D.N.Y. 2010) (citing Lerner v. Fleet Bank, N.A., 459 F.3d 273, 286 (2d Cir. 2006)). The plaintiffs' appeal from the dismissal of their

that LCB assisted Hizballah by facilitating the international financial transactions of a Hizballah-affiliated entity. The plaintiffs allege that LCB carried out dozens of dollar-denominated international wire transfers totaling several million dollars over the course of several years on behalf of the Hizballah affiliate, with the assistance of another defendant, American Express Bank, where LCB maintained and used a correspondent banking account. According to the plaintiffs, in carrying out these transactions, LCB acted with the knowledge that they were for the purpose of facilitating Hizballah's ability to carry out acts of terrorism, such as the rocket attacks at issue here. The plaintiffs assert claims against LCB under the Anti-Terrorism Act, 18 U.S.C. § 2333(a); the Alien Tort Statute, 28 U.S.C. § 1350; and Israeli tort law.

The district court (George B. Daniels, <u>Judge</u>) granted LCB's motion to dismiss for lack of personal jurisdiction on the grounds that LCB's maintenance of a correspondent banking account in New York and use of that account to wire funds on behalf of the Hizballah affiliate were insufficient to establish specific personal jurisdiction over LCB under the New York long-arm statute, N.Y. C.P.L.R. § 302(a)(1). The court concluded both that "[t]he execution of wire transfers . . .

negligence claim against AmEx is addressed in an accompanying opinion.

4

alone is [not] sufficient to confer jurisdiction over a foreign bank," Licci v. Am. Express Bank Ltd., 704 F. Supp. 2d 403, 407 (S.D.N.Y. 2010), and that there was no "articulable nexus or substantial relationship . . . between LCB's general use of its correspondent account for wire transfers through New York and the specific terrorist activities by Hizbollah underlying plaintiffs' claims," id. at 408. The plaintiffs appeal.

The question of whether, and if so to what extent, personal jurisdiction may be established under N.Y. C.P.L.R. § 302(a)(1) over foreign banks based on their use of correspondent banking accounts in New York remains unsettled. We conclude that New York law is insufficiently developed in this area to enable us to predict with confidence how the New York Court of Appeals would resolve these issues of New York State law presented on appeal. We therefore certify to the Court of Appeals two questions concerning the application of the New York long-arm statute.

**BACKGROUND**

The facts set forth below are drawn from the plaintiffs' first amended complaint, see Am. Compl., Licci v. Am. Express Bank Ltd., No. 08 Civ. 7253 (GBD) (S.D.N.Y. Mar. 31, 2010), ECF No. 23 ("Compl."), and from the district court's opinion dismissing the claims against LCB for lack of personal jurisdiction, see Licci, 704 F. Supp. 2d at 404-06. All well-

5

pleaded facts are accepted as true at this stage of the litigation.  See Famous Horse Inc. v. 5th Ave. Photo Inc., 624 F.3d 106, 108 (2d Cir. 2010).  We recite only the facts that we think necessary for an understanding of our resolution of this appeal.

Allegations of the Amended Complaint

According to the allegations contained in the Amended Complaint, between July 12, 2006, and August 14, 2006, Hizballah, an Islamic terrorist organization, fired thousands of rockets into northern Israel.  The plaintiffs or their family members were injured or killed by these attacks.  See Compl. ¶¶ 58-112.

The defendant, LCB, is a Lebanese bank with no branches, offices, or employees in the United States.  LCB does, however, maintain a correspondent banking account at AmEx in New York.[3]  The plaintiffs allege that LCB used this account

---

[3]  "Correspondent accounts are accounts in domestic banks held in the name of [] foreign financial institutions. Typically, foreign banks are unable to maintain branch offices in the United States and therefore maintain an account at a United States bank to effect dollar transactions."  Sigmoil Res., N.V. v. Pan Ocean Oil Corp. (Nigeria), 234 A.D.2d 103, 104, 650 N.Y.S.2d 726, 727 (1st Dep't 1996).  "'Without correspondent banking . . . it would often be impossible for banks to provide comprehensive nationwide and international banking services -- among them, the vital capability to transfer money by wire with amazing speed and accuracy across international boundaries.'" United States v. Davidson, 175 F. App'x 399, 401 n.2 (2d Cir. 2006) (summary order) (quoting Role of U.S. Correspondent Banking in International Money Laundering: Hearings Before the Permanent Subcomm. on Investigations of the S. Comm. on Gov't Affairs, 107th Cong. 1-2 (2001) (opening remarks of Senator Susan M. Collins)).

6

to conduct dozens of international wire transfers on behalf of the Shahid (Martyrs) Foundation ("Shahid"), an entity that maintained bank accounts with LCB and which the plaintiffs allege to be an "integral part" of Hizballah and "part of [its] financial arm." Id. ¶ 46; see also id. ¶ 50 (alleging that the Shahid-titled bank accounts "belonged to Hizbollah and were under the control of Hizbollah"). These wire transfers, which totaled several million dollars, "substantially increased and facilitated Hizbollah's ability to plan, to prepare for[,] and to carry out" the rocket attacks that injured the plaintiffs. Id. ¶ 116.

The plaintiffs contend that LCB's role in conducting those wire transfers on Shahid's behalf was actionable. They allege that LCB had "actual knowledge" that Hizballah was a violent terrorist organization, as reflected on official U.S. government lists,[4] and that Shahid was "part of Hizbollah's financial arm." Id. ¶¶ 130, 135. Moreover, the plaintiffs allege that the bank, as a matter of "official LCB policy,"

_____

[4] LCB notes that at all relevant times, Shahid itself was not designated as a terrorist organization on official U.S. government lists. Shahid was, however, added to the U.S. Treasury Department's "Specially Designated Nationals" list in July 2007. See U.S. Dep't of Treasury, Press Release, Twin Treasury Actions Take Aim at Hizballah's Support Network (July 24, 2007). Shahid today remains on that list of "individuals, groups, and entities, such as terrorists . . . that are not country-specific." See generally U.S. Dep't of Treasury, Specially Designated Nationals List (SDN), http://www.treasury.gov/resource-center/sanctions/SDN-List/Pages/default.aspx (last visited Dec. 21, 2011).

7

"continuously supports and supported Hizbollah and its anti-Israel program, goals and activities."  Id. ¶ 126.  In particular, the plaintiffs allege that LCB carried out the wire transfers "in order to assist and advance Hizbollah's goal of using terrorism to destroy the State of Israel."  Id. ¶ 129.

                    Procedural History

          The plaintiffs began this lawsuit in New York State Supreme Court, New York County, on July 11, 2008.  On August 15, 2008, AmEx removed the matter to the United States District Court for the Southern District of New York.

          On January 22, 2009, the plaintiffs filed an amended complaint.  It contains five claims against LCB: (1) primary liability for international terrorism under the Anti-Terrorism Act, 18 U.S.C. § 2333(a) ("the Anti-Terrorism Act"); (2) aiding-and-abetting liability for international terrorism under the Anti-Terrorism Act; (3) aiding-and-abetting liability for genocide, war crimes, and crimes against humanity in violation of international law, as made actionable by the Alien Tort Statute, 28 U.S.C. § 1350 (the "ATS"); (4) negligence, in violation of Israeli Civil Wrongs Ordinance § 35; and (5) breach of statutory duty, in violation of Israeli Civil Wrongs Ordinance § 63.[5]  The Anti-Terrorism Act claims are brought by

          [5] Substantially the same group of plaintiffs has filed a related lawsuit in the Southern District of New York against Al Jazeera, a Qatar-based television network.  The plaintiffs assert

8

the American plaintiffs alone; the ATS claims are brought by various Canadian and Israeli plaintiffs; and the Israeli-law claims are brought by all but four plaintiffs.

On April 17, 2009, LCB moved to dismiss all claims against it for lack of personal jurisdiction under Rule 12(b)(2) and for failure to state a claim under Rule 12(b)(6). On July 6, 2009, the plaintiffs filed an opposition to LCB's motion and submitted, among other material, a declaration by a former Israeli counter-terrorism official attesting to the fact that Shahid is a financial front for Hizballah. LCB filed a reply on September 3, 2009.

## The District Court's Jurisdictional Ruling

On March 31, 2010, the district court granted LCB's motion to dismiss pursuant to Rule 12(b)(2), concluding that the plaintiffs had failed to make a prima facie showing of personal jurisdiction over the defendants under N.Y. C.P.L.R. § 302(a)(1). See Licci, 704 F. Supp. 2d at 406-08. According to the court, "'[t]o establish personal jurisdiction under

_____

that Al Jazeera violated the Anti-Terrorism Act by purposefully televising the precise impact locations in Israel of Hizballah's rockets in order to assist Hizballah with aiming its attacks more accurately. That lawsuit was dismissed, with leave to amend the complaint, on the grounds that the plaintiffs had failed adequately to plead the elements of intent and proximate causation. See Kaplan v. Al Jazeera, No. 10 Civ. 5298, 2011 WL 2314783, 2011 U.S. Dist. LEXIS 61373 (S.D.N.Y. June 7, 2011) (Kimba M. Wood, J.). A second amended complaint was filed on July 18, 2011, but the plaintiffs voluntarily dismissed the action on November 21, 2011.

section 302(a)(1), two requirements must be met: (1) The defendant must have transacted business within the state; and (2) the claim asserted must arise from that business activity.'"  Id. at 406 (quoting Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC, 450 F.3d 100, 103 (2d Cir. 2006)). The court characterized the plaintiffs' theory of jurisdiction as depending solely upon LCB's "alleged use of defendant Amex Bank as its correspondent bank to carry out wire transfers of funds to and from the Shahid-entitled bank accounts."  Id. at 406.  Rejecting that theory, the court appeared to conclude that neither of the two requirements for jurisdiction under N.Y. C.P.L.R. § 302(a)(1) had been satisfied.

With respect to the first, "transacted business," prong, the district court relied upon the general principle that "[t]he mere maintenance of [a] correspondent bank account with a financial institution in New York is not, standing alone, a sufficient basis to subject a foreign defendant to personal jurisdiction under § 302(a)(1)."  Id. at 407. Although the court acknowledged that in some circumstances, a "foreign bank's improper use of a New York correspondent account" may support long-arm jurisdiction, id. (citing cases), the court concluded that "[t]he execution of wire transfers is not a 'use' of a correspondent account which alone is sufficient to confer jurisdiction over a foreign bank," id., and therefore "no meaningful distinction may be drawn between a foreign bank's maintenance of a correspondent account to effect

10

international wire transfers and its indiscriminate use of that account for that exact purpose," id. at 407-08.

With respect to the second, "arising from," prong, the district court concluded that the plaintiffs' claims did not arise from LCB's wire transfers in New York for the purposes of N.Y. C.P.L.R. § 302(a)(1). Id. at 408. Relying upon the factually similar case of Tamam v. Fransabank SAL, 677 F. Supp. 2d 720, 726-30 (S.D.N.Y. 2010),[6] the district court ruled that "[n]o articulable nexus or substantial relationship exists between LCB's general use of its correspondent account for wire transfers through New York and the specific terrorist activities by Hizbollah underlying plaintiffs' claims." Licci, 704 F. Supp. 2d at 408. In reaching that conclusion, the district court observed that the "[p]laintiffs do not allege that the rocket attacks were directly financed with the subject wire transferred funds," but only that those "transferred funds . . . 'substantially increased' Hizbollah's ability to commit rocket attacks," id. The court further reasoned that "[t]he injuries and death suffered by plaintiffs and their

---

[6] In Tamam, a different group of fifty-seven plaintiffs brought suit against five Lebanese banks (not including LCB) under the ATS for aiding and abetting genocide, and committing crimes against humanity, war crimes, and terrorism by providing financial services to parties associated with Hizballah. The Tamam plaintiffs were, like those in the instant case, either themselves injured in the July and August 2006 rocket attacks, or the survivors of family members killed in those attacks. See Tamam, 677 F. Supp. 2d at 722-24. The district court dismissed the Tamam plaintiffs' lawsuit for lack of personal jurisdiction, see id. at 725-34, and no appeal was taken.

11

family members were caused by the rockets launched by Hizbollah, not by the banking services provided by LCB through its correspondent account." Id. The court decided that "LCB's maintenance or use of its correspondent bank account is [therefore] too attenuated from Hizbollah's attacks in Israel to assert personal jurisdiction based solely on wire transfers through New York." Id.

After deciding that the requirements of N.Y. C.P.L.R. § 302(a)(1) had not been satisfied, the district court also concluded, summarily, that "[t]he exercise of personal jurisdiction over LCB on the basis alleged by plaintiffs would not comport with constitutional principles of due process." Id. The district court also denied the plaintiffs' request for jurisdictional discovery on the ground that such discovery would be "futile."[7] Id. Finally, because the court determined that personal jurisdiction was lacking, the court did not reach the merits of LCB's alternative arguments that dismissal of each of the plaintiffs' claims was warranted under Fed. R. Civ.

---

[7] On appeal, the plaintiffs do not challenge the district court's denial of jurisdictional discovery. We therefore need not decide whether the district court exceeded the bounds of its discretion in this respect. See Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic, 582 F.3d 393, 401 (2d Cir. 2009) (noting that a district court possesses "wide latitude" and "typically [acts] within its discretion to deny jurisdictional discovery when the plaintiff has not made out a prima facie case for jurisdiction") (brackets and internal quotation marks omitted).

12

P. 12(b)(6).  See id. at 406-08.  The district court entered judgment for the defendants on March 31, 2010.

The plaintiffs appeal.

**DISCUSSION**

I.  Standard of Review

"We review a district court's dismissal of an action for want of personal jurisdiction de novo, construing all pleadings and affidavits in the light most favorable to the plaintiff[s] and resolving all doubts in the plaintiff[s'] favor."  Penguin Grp. (USA) Inc. v. Am. Buddha, 609 F.3d 30, 34 (2d Cir. 2010).  "In order to survive a motion to dismiss for lack of personal jurisdiction, [the] plaintiff[s] must make a prima facie showing that jurisdiction exists."  Id. at 34-35 (internal quotation marks omitted).  This prima facie showing "must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant."  Chloé v. Queen Bee of Beverly Hills, LLC, 616 F.3d 158, 163 (2d Cir. 2010) (brackets omitted).  In considering whether the plaintiffs have met this burden, "we will not draw 'argumentative inferences' in the plaintiff's favor," Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 507 (2d Cir. 1994), nor are we required "to accept as true a legal conclusion couched as a factual allegation," Jazini v. Nissan Motor Co., 148 F.3d 181, 185 (2d Cir. 1998).  We review any factual findings regarding personal jurisdiction for clear

13

error.  Sunward Elecs., Inc. v. McDonald, 362 F.3d 17, 22 (2d Cir. 2004).

## II.  Principles of Personal Jurisdiction

The lawful exercise of personal jurisdiction by a federal court requires satisfaction of three primary requirements.

First, the plaintiff's service of process upon the defendant must have been procedurally proper.  See Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc., 526 U.S. 344, 350 (1999); In re Kalikow, 602 F.3d 82, 92 (2d Cir. 2010).  LCB does not deny that it was properly served in Lebanon with the plaintiffs' summons and complaint pursuant to Federal Rule of Civil Procedure 4(f)(2)(C)(ii).

Second, there must be a statutory basis for personal jurisdiction that renders such service of process effective.  The available statutory bases in federal courts are enumerated by Federal Rule of Civil Procedure 4(k).  In this case, the plaintiffs rely solely upon Rule 4(k)(1)(A), which provides that "[s]erving a summons . . . establishes personal jurisdiction over a defendant . . . who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located."[8]  See also Spiegel v.

---

[8] At least two other statutory bases for personal jurisdiction might be relevant to lawsuits brought under the Anti-Terrorism Act: (1) Federal Rule of Civil Procedure 4(k)(2),

14

Schulmann, 604 F.3d 72, 76 (2d Cir. 2010) ("A district court's personal jurisdiction is determined by the law of the state in which the court is located.").  We therefore look to New York law in determining whether personal jurisdiction is available in New York over LCB.[9]

---

which provides for personal jurisdiction in federal-question cases where a defendant is "not subject to jurisdiction in any state's courts of general jurisdiction," but "exercising jurisdiction [would be] consistent with the United States Constitution and laws," Fed. R. Civ. P. 4(k)(2); and (2) the Anti-Terrorism Act's nationwide service of process provision, which provides that a defendant "may be served in any district where the defendant resides, is found, or has an agent."  18 U.S.C. § 2334(a); see also Fed. R. Civ. P. 4(k)(1)(C).  Because the plaintiffs in the instant litigation have relied only upon Rule 4(k)(1)(A), however, we do not consider these alternative bases for jurisdiction here.

[9] There are two types of personal jurisdiction: general and specific.  General jurisdiction is authorized where the defendant's "affiliations with the State are so 'continuous and systematic' as to render [it] essentially at home in the forum State."  Goodyear Dunlop Tires Operations, S.A. v. Brown, 131 S. Ct. 2846, 2851 (2011).  A court asserts "general jurisdiction" over a defendant when the court is permitted to "hear any and all claims against" that defendant.  Id.
       "Specific jurisdiction," however, "depends on an 'affiliation between the forum and the underlying controversy,' principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation."  Id. (brackets omitted).  Such jurisdiction is "confined to adjudication of 'issues deriving from, or connected with, the very controversy that establishes jurisdiction.'"  Id.; see also Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 nn.8-9 (1984) (discussing the terms).
       The plaintiffs do not allege that LCB is subject to general personal jurisdiction in New York.  See N.Y. C.P.L.R. § 301. They argue only that LCB is subject to specific personal jurisdiction under the first subdivision of the New York long-arm statute, N.Y. C.P.L.R. § 302(a)(1).

15

N.Y. C.P.L.R. § 302(a) provides, in pertinent part, that a court "may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent . . . transacts any business within the state," so long as the plaintiff's "cause of action aris[es] from" that "transact[ion]."[10]  Id.  So, in determining whether personal jurisdiction may be exercised under section 302(a)(1), "a court must decide (1) whether the defendant 'transacts any business' in New York and, if so, (2) whether this cause of action 'aris[es] from' such a business transaction."  Best Van Lines, Inc. v. Walker, 490 F.3d 239, 246 (2d Cir. 2007) (citing Deutsche Bank Sec., Inc. v. Montana Bd. of Invs., 7 N.Y.3d 65, 71, 818 N.Y.S.2d 164, 166, 850 N.E.2d 1140, 1142 (2006)).

Third, the exercise of personal jurisdiction must comport with constitutional due process principles.  In this case, because the plaintiffs' assertion of personal jurisdiction rests upon a state long-arm statute, the relevant constitutional constraints are those imposed by the Due Process Clause of the Fourteenth Amendment.  See Chloé, 616 F.3d at

---

[10]  Section 302(a)(1) also authorizes personal jurisdiction where a defendant "contracts anywhere to supply goods or services in the state."  That provision is not at issue in this appeal. Nor do the plaintiffs rely on sections 302(a)(2) or 302(a)(3), which authorize personal jurisdiction for claims arising out of torts committed within and without New York State, respectively.

16

164. The constitutional analysis under the Due Process Clause consists of two separate components: the "minimum contacts" inquiry and the "reasonableness" inquiry. Id. The "minimum contacts" inquiry requires us to consider "whether the defendant has sufficient contacts with the forum state to justify the court's exercise of personal jurisdiction." Id. The "reasonableness" inquiry requires us to decide "whether the assertion of personal jurisdiction comports with 'traditional notions of fair play and substantial justice' -- that is, whether it is reasonable to exercise personal jurisdiction under the circumstances of the particular case." Id.

The New York long-arm statute does not extend in all respects to the constitutional limits established by International Shoe Co. v. Washington, 326 U.S. 310 (1945), and its progeny. The state statutory and federal constitutional standards are thus not co-extensive, as they are in many other states. See, e.g., Best Van Lines, 490 F.3d at 244-45 & n.8 (noting "gaps" between the jurisdiction conferred by the New York long-arm statute and that permissible under the federal Due Process Clause); Banco Ambrosiano, S.p.A. v. Artoc Bank & Trust Ltd., 62 N.Y.2d 65, 71, 476 N.Y.S.2d 64, 67, 464 N.E.2d 432, 435 (1984) ("[I]n setting forth certain categories of bases for long-arm jurisdiction, [the New York long-arm statute] does not go as far as is constitutionally

17

permissible."); see also Patrick J. Borchers, The Problem with General Jurisdiction, 2001 U. Chi. Legal F. 119, 122 & n.17 (collecting examples from other states of long-arm statutes that extend to constitutional limits). Where, as here, the plaintiffs premise their theory of personal jurisdiction upon the New York long-arm statute, we first consider whether the requirements of the statute have been satisfied before proceeding to address whether the exercise of jurisdiction would comport with the Due Process Clause. See Chloé, 616 F.3d at 163-64; Am. Buddha, 609 F.3d at 35; Best Van Lines, 490 F.3d at 242, 244. This reflects our respect for the doctrine of constitutional avoidance. See Ehrenfeld v. Bin Mahfouz, 489 F.3d 542, 547 (2d Cir. 2007); United States v. Magassouba, 544 F.3d 387, 404 (2d Cir. 2008) (collecting cases discussing the doctrine).[11] We therefore address the statutory bases of

---

[11] In many cases, the jurisdictional analysis under the New York long-arm statute may closely resemble the analysis under the Due Process Clause of the Fourteenth Amendment. See Best Van Lines, 490 F.3d at 242 ("[T]he analysis of the state statutory and federal constitutional limitations have become somewhat entangled in New York jurisprudence . . . ."). This similarity of state-law and constitutional standards appears particularly evident with respect to N.Y. C.P.L.R. § 302(a)(1), the subdivision of the New York long-arm statute under which the plaintiffs in this case argue the court has personal jurisdiction over LCB. See Chloé, 616 F.3d at 166, 169 (taking note of these similarities); Best Van Lines, 490 F.3d at 247 (same); Ehrenfeld v. Bin Mahfouz, 9 N.Y.3d 501, 508, 851 N.Y.S.2d 381, 385-86, 881 N.E.2d 830, 834-45 (2007) (same).

personal jurisdiction prior to considering the constitutional limitations.  See, e.g., Am. Buddha, 609 F.3d at 35.

III.  Long-Arm Jurisdiction Under Section 302(a)(1)

A.    Transaction of Business in New York

The first question we consider is whether a foreign bank's maintenance of a correspondent banking account in New York, and use of that account over the course of several years to effect a succession of wire transfers totaling several million dollars on behalf of a foreign client, constitutes a transaction of business within New York.  The New York Court of Appeals has explained that "the overriding criterion necessary to establish a transaction of business is some act by which the defendant purposefully avails itself of the privilege of conducting activities within New York," Ehrenfeld, 9 N.Y.3d at 508, 851 N.Y.S.2d at 385, 881 N.E.2d at 834 (brackets and internal quotation marks omitted), thereby "invoking the benefits and protections of its laws," Fischbarg v. Doucet, 9 N.Y.3d 375, 380, 849 N.Y.S.2d 501, 505, 880 N.E.2d 22, 26 (2007).

A defendant need not physically enter New York State in order to transact business, "so long as the defendant's activities here were purposeful."  Id. (quoting Deutsche Bank Sec., Inc., 7 N.Y.3d at 71, 818 N.Y.S.2d at 167, 850 N.E.2d at 1142).  "Not all purposeful activity, however, constitutes a

19

'transaction of business' within the meaning of [N.Y. C.P.L.R. § 302(a)(1)]." Id. For example, the Court of Appeals has indicated that "'merely telephon[ing] a single order' to New York requesting a shipment of goods to another state, [or] the transitory presence of a corporate official here, [or] communications and shipments sent here by an out-of-state doctor serving as a 'consultant' to plaintiff's New York physician do not support [N.Y. C.P.L.R. § 302(a)(1)] jurisdiction." Id. (citations omitted).

"Although it is impossible to precisely fix those acts that constitute a transaction of business . . . it is the quality of the defendants' New York contacts that is the primary consideration." Id. A single act within New York will, in the proper case, satisfy the requirements of section 302(a)(1). See Deutsche Bank, 7 N.Y.3d at 72, 818 N.Y.S.2d at 167, 850 N.E.2d at 1143 ("[W]hen the requirements of due process are met, as they are here, a sophisticated institutional trader knowingly entering our state -- whether electronically or otherwise -- to negotiate and conclude a substantial transaction is within the embrace of the New York long-arm statute."). Other times, however, when an individual act in New York will not suffice, an ongoing course of conduct or relationship in the state may. See, e.g., Fischbarg, 9 N.Y.3d at 382-83, 849 N.Y.S.2d at 507, 880 N.E.2d 22 at 28

20

(defendants' "substantial ongoing professional commitment" supported long-arm jurisdiction); <u>Longines-Wittnauer Watch Co. v. Barnes & Reinecke, Inc.</u>, 15 N.Y.2d 443, 458, 261 N.Y.S.2d 8, 19, 209 N.E.2d 68, 76 (1965); <u>Grimaldi v. Guinn</u>, 72 A.D.3d 37, 44, 895 N.Y.S.2d 156, 162 (2d Dep't 2010). A court must have regard for the "totality of the circumstances." <u>Farkas v. Farkas</u>, 36 A.D.3d 852, 853, 830 N.Y.S.2d 220, 221 (2d Dep't 2007); <u>accord</u> <u>Best Van Lines</u>, 490 F.3d at 246.

The plaintiffs assert that LCB's maintenance and use of its correspondent banking account in New York was sufficiently purposeful to constitute a transaction of business within New York State. They emphasize that they rely not only on the fact that LCB owned a correspondent banking account in New York, but also on the fact that LCB allegedly used that account "dozens" of times to execute international wire transfers on Shahid's behalf. Compl. ¶ 53.

The district court rejected the plaintiffs' proffered distinction. Relying upon a line of Second Circuit district-court cases, the court stated that "[t]he mere maintenance of [a] correspondent bank account with a financial institution in New York is not, standing alone, a sufficient basis to subject a foreign defendant to personal jurisdiction under § 302(a)(1)." <u>Licci</u>, 704 F. Supp. 2d at 407 (citing <u>Tamam</u>, 677 F. Supp. 2d at 727; <u>Daventree Ltd. v. Republic of Azerbaijan</u>,

21

349 F. Supp. 2d 736, 762 (S.D.N.Y. 2004); and Leema Enters., Inc. v. Willi, 575 F. Supp. 1533, 1537 (S.D.N.Y. 1983)). Although the district court acknowledged the plaintiffs' attempt to distinguish between the "'mere maintenance of correspondent banking accounts'" and "'the active execution . . . of dozens of wire transfers totaling millions of dollars over a multi-year period,'" Licci, 704 F. Supp. 2d at 407 (emphasis omitted), the court concluded that "no meaningful distinction may be drawn between a foreign bank's maintenance of a correspondent account to effect international wire transfers and its indiscriminate use of that account for that exact purpose," id. at 407-08.

The New York Court of Appeals has apparently not yet addressed the precise question before the district court and now before us: whether a foreign bank's frequent use of a correspondent account in New York to effect international wire transfers on behalf of an overseas client is an act directed with sufficient purposefulness at New York to constitute a transaction of business in that state under the long-arm statute. And, of course, the district court did not itself have the ability to ask the New York Court of Appeals for guidance. See N.Y. Comp. Codes R. & Regs. tit. 22, § 500.27(a).

22

New York courts have, however, considered several similar sets of circumstances.  In perhaps the most prominent case concerning a similar issue, Amigo Foods Corp. v. Marine Midland Bank-N.Y., 39 N.Y.2d 391, 384 N.Y.S.2d 124, 348 N.E.2d 581 (1976), the Court of Appeals addressed the question "whether, under the governing long-arm jurisdiction statute [N.Y. C.P.L.R. § 302(a)(1), also invoked here], a showing that a New York bank is the correspondent of an out-of-State bank provides a sufficient basis upon which New York courts may exercise jurisdiction over the out-of-State bank."  Id. at 393, 384 N.Y.S.2d at 125, 348 N.E.2d at 582.

The plaintiff, a New York wholesaler, had contracted to buy several truckloads of potatoes from a Maine distributor.  After the plaintiff made payment, its letter of credit passed through a New York correspondent account owned by one of the defendants, Aroostook Trust Company, a Maine bank.  Id. at 394, 384 N.Y.S.2d at 126, 348 N.E.2d at 582.

The Appellate Division dismissed the plaintiff's claims against Aroostook, "holding that a correspondent bank relationship was an insufficient basis upon which to predicate long-arm jurisdiction."  Id. at 395, 384 N.Y.S.2d at 126, 348 N.E.2d at 583.  And the Court of Appeals declined to hold that a correspondent bank relationship in New York "suffic[ed], in and of itself," to support the exercise of personal

jurisdiction. Id. at 395, 384 N.Y.S.2d at 127, 348 N.E.2d at 583. The court announced a general rule that "standing by itself, a correspondent bank relationship, without any other indicia or evidence to explain its essence, may not form the basis for long-arm jurisdiction under [N.Y. C.P.L.R. § 302(a)(1)]." Id. at 396, 384 N.Y.S.2d at 127, 348 N.E.2d at 584. The court then remanded for jurisdictional discovery to permit the plaintiff to establish that the general rule did not apply. Discovery would allow the plaintiff to inquire into, among other things, "the precise nature of [Aroostook's] relationship with [its correspondent bank in New York] vis-à-vis the handling of [the plaintiff's] letters of credit." Id.

Several years later, in Ehrlich-Bober & Co. v. Univ. of Houston, 49 N.Y.2d 574, 427 N.Y.S.2d 604, 404 N.E.2d 726 (1980), the Court of Appeals upheld the exercise of personal jurisdiction over a public university located in Texas based upon the fact that the university -- which had contracted to sell securities to the plaintiff, a New York securities dealer – employed the services of a correspondent bank in New York to carry out the transaction. Id. at 577, 427 N.Y.S.2d at 606, 404 N.E.2d at 728. The Court of Appeals concluded that "[a]lthough 'standing by itself, a correspondent bank relationship . . . may not form the basis for long-arm

24

jurisdiction under [N.Y. C.P.L.R. § 302(a)(1)],' the facts alleged here, which we accept as true for this purpose, show substantially more." Id. at 579, 427 N.Y.S.2d at 607, 404 N.E.2d at 729 (quoting Amigo Foods, 39 N.Y.2d at 396, 384 N.Y.S.2d at 127, 348 N.E.2d at 584) (citation omitted). The court appeared to regard as relevant the fact that the contractual transactions at issue had been "centered" in New York.[12] Id. at 581-82, 427 N.Y.S.2d at 609, 404 N.E.2d at 731 ("[T]he transactions in question . . . were initiated by an employee of the defendant university in a phone call to the plaintiff's New York offices. They were accepted in New York by the plaintiff. The money was paid in New York. The securities were delivered in New York.").

In Banco Ambrosiano v. Artoc Bank & Trust, 62 N.Y.2d 65, 476 N.Y.S.2d 64, 464 N.E.2d 432 (1984), a decision applying due process standards rather than the long-arm statute, the Court of Appeals upheld the exercise of quasi-in-rem jurisdiction over a Bahamian bank based upon its use of a correspondent account in New York to conduct a loan transaction

_____

[12] The principal issue on appeal in Ehrlich-Bober & Co. was not the scope of N.Y. C.P.L.R. § 302(a)(1), but whether the trial court should have declined jurisdiction over the plaintiff's suit against the defendant university as a matter of comity based upon a Texas statute limiting the jurisdictions in which the university is subject to suit. Id. at 577-79, 427 N.Y.S.2d at 606-07, 404 N.E.2d at 728-29.

with the plaintiff, id. at 72-73, 476 N.Y.S.2d at 67-68, 464 N.E.2d at 435-36. The court, emphasizing the "quality of this contact and its significance in the context of this litigation," viewed the bank's correspondent account as "closely related to plaintiff's claim" because it was "the very account through which [the bank] effectuated the transaction at issue." Id. at 72, 476 N.Y.S.2d at 67-68, 464 N.E.2d at 435-36. The court also appeared to rely on the fact that "this transaction [was not] an isolated one" inasmuch as the bank had "utilize[d] this account regularly to accomplish its international banking business." Id. at 72-73, 476 N.Y.S.2d at 68, 464 N.E.2d at 436. Although the court's decision rested not on a determination that the New York long-arm statute was satisfied, but on a conclusion that the exercise of quasi-in-rem jurisdiction under the circumstances would not violate due process standards, see generally id. at 71-73, 476 N.Y.S.2d at 66-68, 464 N.E.2d at 434-36, the decision may be relevant insofar as the statutory and constitutional inquiries "have become . . . entangled in New York jurisprudence." Best Van Lines, 490 F.3d at 242.

In Indosuez International Finance B.V. v. National Reserve Bank, 98 N.Y.2d 238, 746 N.Y.S.2d 631, 774 N.E.2d 696 (2002), the Court of Appeals upheld the exercise of personal jurisdiction in New York over a Russian bank that had

26

maintained a bank account in New York and used it in connection with currency-exchange options transactions with the plaintiff. The court ruled that the bank's "course of dealing" in making and accepting payments through a New York bank "constitute[d] purposeful exercise . . . of the privilege of conducting business in New York State sufficient to subject it to personal jurisdiction" under N.Y. C.P.L.R. § 302(a)(1).  Id. at 247, 746 N.Y.S.2d at 636, 774 N.E.2d at 701.

Those four decisions suggest to us that the "transaction of business" prong of the test for jurisdiction under section 302(a)(1) may, in appropriate cases, be satisfied by a showing that the defendant maintained and used a correspondent bank account in New York.  Some New York State courts nonetheless seem to regard a nondomiciliary defendant's maintenance and use of such an account in New York, standing alone, as ipso facto insufficient to support personal jurisdiction under the New York long-arm statute.  See Faravelli v. Bankers Trust Co., 85 A.D.2d 335, 339, 447 N.Y.S.2d 962, 964-65 (1st Dep't 1982) ("[T]he fact that Punjab had correspondent banks in New York in and of itself [does not] provide sufficient contacts for longarm jurisdiction under [N.Y. C.P.L.R. § 302]."), aff'd for the reasons stated by the Appellate Division, 59 N.Y.2d 615, 618, 463 N.Y.S.2d 194, 449 N.E.2d 1272 (1983); Nemetsky v. Banque de Developpement de la

27

Republique du Niger, 65 A.D.2d 748, 748-49, 407 N.Y.S.2d 556, 557 (2d Dep't 1978) ("Even if the trade acceptance [upon which plaintiff brought suit] were shown to be part of the [defendant's] correspondent bank relationship [with a New York bank], that relationship does not itself provide the basis for long arm jurisdiction under [N.Y. C.P.L.R. § 302(a)(1)]."), aff'd mem., 48 N.Y.2d 962, 964, 425 N.Y.S.2d 277, 401 N.E.2d 388 (1979) ("All that appears is a correspondent bank relationship between defendant and Credit Lyonnais and the trade acceptance connected to that relationship.  These factors standing alone are insufficient to support an exercise of in personam jurisdiction . . . ."); Taub v. Colonial Coated Textile Corp., 54 A.D.2d 660, 661, 387 N.Y.S.2d 869, 870 (1st Dep't 1976) (depending on Amigo Foods for the conclusion that an Israeli bank's use of a correspondent account in New York does not suffice to establish long-arm jurisdiction).  And federal district court decisions in this Circuit have relied upon these state-court decisions and Amigo Foods' statement that a correspondent banking relationship "standing by itself" does not suffice, Amigo Foods, 39 N.Y.2d at 396, 384 N.Y.S.2d at 127, 348 N.E.2d at 584, to conclude that the "mere

28

maintenance" of a correspondent bank account in New York does not suffice to establish personal jurisdiction there.[13]

Assuming for present purposes that this "mere maintenance" principle is a faithful articulation of the Court of Appeals' decision in Amigo Foods, it is unclear to us how to apply it to the facts of this case: What role is the word "mere" intended to play? It may be, as the plaintiffs suggest, that it is intended to distinguish the "maintenance" of an account from its active use. See Licci, 704 F. Supp. 2d at 407 (describing this argument). But perhaps it is intended to suggest that other types of contacts with the forum -- such as borrowing money in New York, signing notes payable in New York, or negotiating agreements in New York -- are also required in

_____

[13] See, e.g., Tamam, 677 F. Supp. 2d at 727 ("[M]erely maintaining a New York correspondent bank account is insufficient to subject a foreign bank to personal jurisdiction."); Neewra, Inc. v. Manakh Al Khaleej Gen. Trading & Contracting Co., No. 03 Civ. 2936, 2004 WL 1620874, at *3, 2004 U.S. Dist. LEXIS 13556, at *10 (S.D.N.Y. July 20, 2004); Societe Generale v. Fla. Health Scis. Ctr., Inc., No. 03 Civ. 5615, 2003 WL 22852656, at *4, 2003 U.S. Dist. LEXIS 21502, at *11 (S.D.N.Y. Dec. 1, 2003) (merely maintaining correspondent bank account is not sufficient); Globex Int'l Inc. v. Commercial Bank of Namibia Ltd., No. 99 Civ. 4789, 1999 WL 529538, at *1, 1999 U.S. Dist. LEXIS 11321, at *2 (S.D.N.Y. July 23, 1999) (same); Semi Conductor Materials, Inc. v. Citibank Int'l PLC, 969 F. Supp. 243, 246-47 (S.D.N.Y. 1997) (same); Johnson Elec. N. Am., Inc. v. Bank of Wales, PLC, No. 90 Civ. 6683, 1991 WL 20006, at *2, 1991 U.S. Dist. LEXIS 1596, at *5 (S.D.N.Y. Feb. 8, 1991) (same); Celton Man Trade, Inc. v. UTEX S.A., No. 84 Civ. 8179, 1986 WL 6788, at *4, 1986 U.S. Dist. LEXIS 24280, at *12 (S.D.N.Y. June 12, 1986) (same); Exchange Nat'l Bank of Chicago v. Empresa Minera del Centro del Peru S.A., 595 F. Supp. 502, 505 (S.D.N.Y. 1984) (same).

order to permit jurisdiction over the defendant to be exercised.  See, e.g., <u>DirecTV Latin Am., LLC v. Park 610, LLC</u>, 691 F. Supp. 2d 405, 423 (S.D.N.Y. 2010).  Or it may be that the term means that a transaction of business in New York will not suffice unless the plaintiff's cause of action also "arise[s] from" that transaction -- in other words, that the second prong of the test must also be satisfied.[14]  See <u>Neewra, Inc.</u>, 2004 WL 1620874, at *3, 2004 U.S. Dist. LEXIS 13556, at *10 ("A foreign bank's mere maintenance of a correspondent account . . . is not enough . . . .  On the other hand, 'a cause of action arising out of a transaction involving the <u>use</u> of a correspondent account may confer jurisdiction over [the] defendant in New York.'") (citation omitted; emphasis in original).

-------

[14] District courts in this Circuit have upheld personal jurisdiction based upon a defendant's use of a correspondent bank account in New York where the use of that account was held to lay at the "very root of the [plaintiff's] action." <u>Correspondent Servs. Corp. v. J.V.W. Invs. Ltd.</u>, 120 F. Supp. 2d 401, 4005 (S.D.N.Y. 2000); <u>see also, e.g.</u>, <u>Dale v. Banque SCS Alliance S.A.</u>, No. 02 Civ. 3592, 2005 WL 2347853, at *3, 2005 U.S. Dist. LEXIS 20967, at *12-*13 (S.D.N.Y. Sept. 22, 2005) (upholding jurisdiction based on defendant's use of "several correspondent bank accounts in New York . . . to effect a number of the funds transfers that are the subject of this action"); <u>Chase Manhattan Bank v. Banque Generale du Commerce</u>, No. 96 Civ. 5184, 1997 WL 266968, at *2 (S.D.N.Y. May 20, 1997) (finding personal jurisdiction proper based on the defendant's use of a correspondent account in New York because "the [plaintiff's] cause of action arises out of [that] use").

Were we required to decide ourselves, we might conclude -- in light of the Court of Appeals' post-Amigo Foods decisions in Ehrlich-Bober & Co., Banco Ambrosiano, and Indosuez -- that Amigo Foods is best read as standing for the proposition that the first prong of the long-arm jurisdiction test under N.Y. C.P.L.R. § 302(a)(1) – whether the defendant has transacted business within New York – may be satisfied by the defendant's use of a correspondent bank account in New York, even if no other contacts between the defendant and New York can be established, if the defendant's use of that account was purposeful.  Whether or not we would think it necessary to certify that question to the New York Court of Appeals were it the only one that challenged us, in light of the fact that we are asking the court to address the second, "arising from," prong of the test for long-arm jurisdiction, we consider it prudent to ask that court also to address the first prong of the test, and to further explicate its guidance in Amigo Foods -- if, of course, it chooses to do so.  Accordingly, we certify the following question to the New York Court of Appeals for its consideration:

> (1)  Does a foreign bank's maintenance of a correspondent bank account at a financial institution in New York, and use of that account to effect "dozens" of wire transfers on behalf of a foreign client, constitute a "transact[ion]" of business in

New York within the meaning of N.Y. C.P.L.R. § 302(a)(1)?

B.   Nexus Between Plaintiffs' Claims
     and Defendant's Transaction in New York

If the first prong of the test for jurisdiction under N.Y. C.P.L.R. § 302(a)(1) has been satisfied, a question as to which we are asking the New York Court of Appeals for help, we must then inquire whether the plaintiffs' claims arise from that transaction.  We have explained, with respect to this "nexus" requirement, that "'[a] suit will be deemed to have arisen out of a party's activities in New York if there is an articulable nexus, or a substantial relationship, between the claim asserted and the actions that occurred in New York.'" Best Van Lines, 490 F.3d at 246 (quoting Henderson v. INS, 157 F.3d 106, 123 (2d Cir. 1998)); see also Kreutter v. McFadden Oil Corp., 71 N.Y.2d 460, 467, 527 N.Y.S.2d 195, 198, 522 N.E.2d 40, 43 (1988) (employing a "substantial relationship" test); McGowan v. Smith, 52 N.Y.2d 268, 272, 437 N.Y.S.2d 643, 645, 419 N.E.2d 321, 323 (1981) (employing an "articulable nexus" test).  "[J]urisdiction is not justified [under N.Y. C.P.L.R. § 302(a)(1)] where the relationship between the claim and transaction is too attenuated," Johnson v. Ward, 4 N.Y.3d 516, 520, 797 N.Y.S.2d 33, 35, 829 N.E.2d 1201, 1203 (2005), and "[a] connection that is 'merely coincidental' is insufficient to support jurisdiction," Sole Resort, 450 F.3d at

32

103 (quoting Johnson, 4 N.Y.3d at 520, 797 N.Y.S.2d at 35, 829 N.E.2d at 1203); see also Fischbarg, 9 N.Y.3d at 384, 849 N.Y.S.2d at 508-09, 880 N.E.2d at 29-30 (a contact's "tangential relationship to the present case" will not suffice).

There is no bright-line test for determining whether the "nexus" is present in a particular case. "This inquiry is a fact-specific one, and [the point at which] the connection between the parties' activities in New York and the [plaintiffs'] claim crosses the line from 'substantially related' to 'mere coincidence' is not always self-evident." Sole Resort, 450 F.3d at 103. We observed:

> In cases where claims have been dismissed on jurisdictional grounds for lack of a sufficient nexus between the parties' New York contacts and the claim asserted, the event giving rise to the plaintiff's injury had, at best, a tangential relationship to any contacts the defendant had with New York. In fact, in those cases, the injuries sustained and the resulting disputes bore such an attenuated connection to the New York activity upon which the plaintiffs attempted to premise jurisdiction that the disputes could not be characterized as having "arisen from" the New York activity.

Id. at 104.

The district court, deciding that the nexus requirement was not satisfied in this case, concluded that "[n]o articulable nexus or substantial relationship exists between LCB's general use of its correspondent account for wire

33

transfers through New York and the specific terrorist

activities by Hizbollah underlying plaintiffs' claims."[15]

Licci, 704 F. Supp. 2d at 408.  In reaching that conclusion,

the court relied principally upon two observations.  First, the

court noted that the "[p]laintiffs themselves are not customers

of . . . [LCB], nor did they have any financial interest in the

wired funds," id., thereby distinguishing several cases that

had upheld personal jurisdiction based upon a defendant's use

of a correspondent banking account in New York.[16]  Second, the

court concluded that "[t]he injuries and death[s] suffered by

plaintiffs and their family members were caused by the rockets

launched by Hizbollah, not by the banking services provided by

LCB through its correspondent account or wire transfers with

Amex Bank via New York."[17]  Id.  Based on this assertion, the

---

[15] In conducting its analysis into whether the plaintiffs'
claims "aris[e] from" LCB's transaction of business in New York
for the purposes of section 302(a)(1), the district court did not
separately evaluate the plaintiffs' Anti-Terrorism Act, ATS, and
Israeli-law claims.

[16] See Dale, 2005 WL 2347853, at *3, 2005 U.S. Dist. LEXIS
20967, at *12-*13; Correspondent Servs. Corp., 120 F. Supp. 2d at
405; Chase Manhattan Bank, 1997 WL 266968, at *2, 1997 U.S. Dist.
LEXIS 7020, at *4-*7.

[17] This conclusion echoed the one reached in the factually
similar Tamam case, in which the court stated: "It is clear that
the events giving rise to the physical injuries and deaths for
which Plaintiffs seek redress are missile attacks in Israel, not
funds transfers in New York."  Tamam, 677 F. Supp. 2d at 728.
Indeed, there, as here, the district court concluded that the
plaintiffs had failed to demonstrate a "'substantial

34

district court concluded that "LCB's maintenance or use of its correspondent bank account is too attenuated from Hizbollah's attacks in Israel to assert personal jurisdiction based solely on wire transfers through New York."  Id.

The district court was of course correct in observing that the rockets launched by Hizballah were the alleged immediate cause of the plaintiffs' injuries or their relatives' deaths.  But the plaintiffs bring their claims against LCB for its role in the transfer of funds to Hizballah.  And the jurisdictional nexus analysis directs us to consider the relationship between the plaintiffs' claims and LCB's alleged transactions in New York.  It may be that the district court, in concluding that "[t]he injuries and death[s] suffered by plaintiffs" were caused by Hizballah rather than LCB, id., was reaching a conclusion that properly bears upon the ultimate merits of plaintiffs' claims, which seek to hold LCB liable for damages allegedly inflicted by Hizballah.[18]  And while we may

---

relationship' between the correspondent bank accounts and Hizbollah's terrorist activity."  Id. at 727-30.

[18] As discussed below, the parties vigorously dispute whether the plaintiffs, to state a claim against LCB under the Anti-Terrorism Act, must demonstrate a causal connection between LCB's provision of banking services and Hizballah's rocket attacks.  Because this case reaches us solely on appeal from a Rule 12(b)(2) dismissal, however, we need not and do not address the parties' arguments concerning the existence vel non of such a causation requirement under the Anti-Terrorism Act at this time.

35

eventually be required to address the merits, such merits determinations do not bear on the pure state-law question of whether the plaintiffs can show that the facts alleged in the complaint in support of their claims are sufficient to establish personal jurisdiction under the New York long-arm statute.

On appeal from the district court's judgment in this regard, the plaintiffs make several arguments directed solely to their Anti-Terrorism Act claims, and others that appear directed primarily to their other claims.

1. The Anti-Terrorism Act Claims. On appeal, the plaintiffs focus their arguments primarily on the district court's treatment of their Anti-Terrorism Act claims.

The Anti-Terrorism Act, enacted in 1990,[19] provides that "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States." 18 U.S.C. § 2333(a). For an act to

---

[19] The Anti-Terrorism Act was originally enacted in 1990. Due to a procedural error, however, the Anti-Terrorism Act was repealed in April 1991 and later re-introduced and reenacted in substantially the same form. The current text of the Anti-Terrorism Act, codified at 18 U.S.C. § 2333, was enacted in 1992. See Wultz v. Islamic Republic of Iran, 755 F. Supp. 2d 1, 19 n.1 (D.D.C. 2010) (summarizing this history); Strauss v. Credit Lyonnais, S.A., 249 F.R.D. 429, 444 (E.D.N.Y. 2008) (same).

36

constitute "international terrorism," it must satisfy four separate requirements: (1) it must "involve violent acts or acts dangerous to human life"; (2) it must qualify as "a violation of the criminal laws of the United States or of any State" if it were committed within a United States jurisdiction; (3) it must "appear to be intended" to intimidate a civilian population, influence government policy, or affect the conduct of government by certain specified means; and (4) it must occur primarily outside the United States or transcend national boundaries.  Id. § 2331(1)(A)-(C).  The Seventh Circuit, and several district courts in this Circuit, have concluded that a defendant's violation of the criminal material-support statutes, see 18 U.S.C. §§ 2339A, 2339B & 2339C,[20] constitutes an act of "international terrorism" within the meaning of section 2331(1).  According to these courts, victims of terrorism therefore may bring civil suits against

---

[20] Those three statutes criminalize, respectively: (1) "provid[ing] material support or resources . . . knowing or intending that they are to be used in preparation for[] or in carrying out" certain identified criminal offenses, 18 U.S.C. § 2339A(a); (2) "knowingly provid[ing] material support or resources to a foreign terrorist organization," id. § 2339B(a)(1); and (3) "directly or indirectly . . . provid[ing] or collect[ing] funds with the intention that such funds be used, or with the knowledge that such funds are to be used, in full or in part, in order to carry out . . . any [] act intended to cause death or serious bodily injury to a civilian," id. § 2339C(a)(1). Each of the three statutes contain further provisions defining or limiting their terms.

37

violators of those statutes under section 2333(a), see, e.g., Boim v. Holy Land Found. for Relief and Dev. (Boim II), 549 F.3d 685, 690-91 (7th Cir. 2008) (en banc), cert. denied, 130 S. Ct. 458 (2009); Boim v. Quranic Literacy Inst. (Boim I), 291 F.3d 1000, 1012-16 (7th Cir. 2002).

The plaintiffs contend that the district court's decision reflects a mistaken understanding about the elements of an Anti-Terrorism Act cause of action -- in particular, the extent to which proof of causation is required to sustain such a claim. See Pls.' Br. at 16-25 (citing Holder v. Humanitarian Law Project, 130 S. Ct. 2705, 2720, 2729 (2010) (concluding that Congress could lawfully criminalize the provision of "training" or "expert advice or assistance" to terrorist groups, even when the assistance was intended to further non-violent or humanitarian ends, because the recipients of such assistance could nonetheless use it "as part of a broader strategy to promote terrorism"); Boim II, 549 F.3d at 695 (concluding that a charity which donates money to a terrorist organization may be held liable under the Anti-Terrorism Act -- even if a plaintiff is unable to prove that the money the charity donated actually helped finance the attacks that injured the plaintiff -- if a plaintiff proves that the charity "kn[ew] the [terrorist] character of that [donee] organization.")). However, the plaintiffs' contentions

regarding the scope of the Anti-Terrorism Act bear upon the merits of this case. The question we confront here, and the question we ask the Court of Appeals to consider, is an antecedent question of state law: whether the plaintiffs' claims, as supported by the facts alleged, see Chloé, 616 F.3d at 163 (determining whether plaintiff alleged "facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant" under the New York long-arm statute) (brackets omitted), arise from LCB's transaction of business in New York, thereby giving rise to personal jurisdiction over LCB under the New York long-arm statute.

As an initial matter, we conclude that the district court was mistaken about what alleged conduct by LCB is being relied upon by the plaintiffs as giving rise to the their claims. The plaintiffs' claims are not premised on allegations that LCB played a direct role in committing or facilitating the particular rocket attacks that injured the plaintiffs. They are based upon the assertion that LCB knowingly wired money on behalf of a Hizballah affiliate through New York; that LCB purposefully did so in order to assist Hizballah (irrespective of how it intended the money would be used by Hizballah, or how it was in fact used); that these services constituted material support to a terrorist organization; and that LCB therefore

39

violated the Anti-Terrorism Act. It would appear, then, that LCB's transactions in New York are among the operative facts underpinning the plaintiffs' Anti-Terrorism Act claims as alleged. Cf. Pls.' Br. at 20 (asserting that "the entire actus reus of the torts attributed to LCB in the [amended complaint] is none other than LCB's transfers to Hezbollah via its account at Amex Bank in New York"). We nonetheless conclude that we are without sufficient guidance to permit us to resolve the state-law question authoritatively.

Once again, the question is whether, as a matter of New York law, the plaintiffs' Anti-Terrorism Act claims, as they are alleged by the plaintiffs, "aris[e] from" the defendants' transaction of business in New York within the meaning of N.Y. C.P.L.R. § 302(a)(1). But two ambiguities are present in the New York Court of Appeals' statement that a sufficient nexus exists where "there is a substantial relationship between [a New York] transaction and the claim asserted," Kreutter, 71 N.Y.2d at 467, 527 N.Y.S.2d at 198, 522 N.E.2d at 43 (emphases added) -- what is a "substantial relationship"? And, what is a "claim"?

**a. What is a "substantial relationship" for purposes of N.Y. C.P.L.R. § 302(a)(1)?**

First, it remains unclear to us what sort of causal connection, if any, must be demonstrated between a defendant's

40

New York activities and a plaintiff's "claim" under the New York long-arm statute's nexus requirement. Some courts have interpreted the Court of Appeals' decisions in McGowan v. Smith, 52 N.Y.2d 268, 437 N.Y.S.2d 643, 419 N.E.2d 321 (1981), and similar cases, as holding that N.Y. C.P.L.R. § 302(a)(1) contains a nexus requirement that is considerably stricter than its constitutional analogue. See Graphic Controls Corp. v. Utah Med. Prods., Inc., 149 F.3d 1382, 1386-87 (Fed. Cir. 1998) (concluding that the statutory nexus requirement has been "interpreted very narrowly" by the New York Court of Appeals); Beacon Enters, Inc. v. Menzies, 715 F.2d 757, 764-65 & n.6 (2d Cir. 1983) (stating that N.Y. C.P.L.R. § 302(a)(1) requires proof of "a strong nexus," meaning "'a direct relation between the cause of action and the in-state conduct'" (quoting Fontanetta v. Am. Bd. of Internal Med., 421 F.2d 355, 357 (2d Cir. 1970))); Talbot v. Johnson Newspaper Corp., 123 A.D.2d 147, 149, 511 N.Y.S.2d 152, 154 (3d Dep't 1987) ("A defendant may not be subject to personal jurisdiction under [N.Y. C.P.L.R. § 302(a)(1)] simply because her contact with New York was a link in the chain of events giving rise to the cause of action[.]"), aff'd, 71 N.Y.2d 827, 527 N.Y.S.2d 729, 522 N.E.2d 1027 (1988). Those interpretations appear to be consistent with the view that the New York long-arm statute requires that the defendant's contacts with New York be the "proximate cause"

41

of the plaintiff's injuries.  Cf., e.g., Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n, 142 F.3d 26, 35 (1st Cir. 1998) (concluding that, to comport with the Due Process Clause, the exercise of specific jurisdiction requires proof that the defendant's forum contacts were the proximate cause of the plaintiff's injury); see generally Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d 1063, 1078-79 (10th Cir. 2008) (describing "proximate cause" approach and comparing it to other approaches); O'Connor v. Sandy Lane Hotel Co., 496 F.3d 312, 318-19 (3d Cir. 2007) (same).  This view may find support in the text of the long-arm statute itself, insofar as it provides jurisdiction only for a plaintiff's "cause of action arising from" an enumerated act by the defendant.  N.Y. C.P.L.R. § 302(a).

Other courts have assumed or suggested, however, that the nexus requirement of the New York long-arm statute is relatively permissive.  See, e.g., Sole Resort, 450 F.3d at 104 (implying that the nexus requirement is met unless "the event giving rise to the plaintiff's injury had, at best, a tangential relationship to any contacts the defendant had with New York"); PDK Labs, Inc. v. Friedlander, 103 F.3d 1105, 1109 (2d Cir. 1997) ("A cause of action arises out of a defendant's New York transactions when it is 'sufficiently related to the business transacted that it would not be unfair to deem it to

42

arise out of the transacted business.'" (quoting <u>Hoffritz for Cutlery, Inc. v. Amajac, Ltd.</u>, 763 F.2d 55, 59 (2d Cir. 1985))).  These interpretations evoke the "substantial connection" or "discernible relationship" approaches, <u>O'Connor</u>, 496 F.3d at 319-20, and reflect the view that the proper test for satisfaction of the nexus requirement should not be causally based.  <u>See, e.g.</u>, <u>Vons Cos., Inc. v. Seabest Foods, Inc.</u>, 14 Cal. 4th 434, 456, 475, 926 P.2d 1085, 1099, 1112 (1996) (adopting a "substantial nexus or connection" approach in applying the California long-arm statute and, in rejecting other approaches, questioning the wisdom "of importing a causation test from tort law to measure a matter that is fundamentally one of relationship and fairness rather than causation").  <u>But cf.</u> <u>Chew v. Dietrich</u>, 143 F.3d 24, 29-30 (2d Cir.) (suggesting in <u>dicta</u> that the "relatedness" test under the Due Process Clause may require proof of either but-for or proximate causation), <u>cert. denied</u>, 525 U.S. 948 (1998).  To the extent that the Court of Appeals determined in <u>Kreutter</u> and <u>McGowan</u> that the nexus requirement may be satisfied by a showing of a "substantial relationship" or an "articulable nexus," respectively, <u>see</u> <u>Kreutter</u>, 71 N.Y.2d at 467, 527 N.Y.S.2d at 198, 522 N.E.2d at 43; <u>McGowan</u>, 52 N.Y.2d at 272, 437 N.Y.S.2d at 645, 419 N.E.2d at 323, it would appear as though no showing of causation is required by N.Y. C.P.L.R.

43

§ 302(a)(1). <u>Cf.</u> <u>Thomason v. Chem. Bank</u>, 234 Conn. 281, 290, 661 A.2d 595, 600-01 (1995) (concluding, as to Connecticut's long-arm statute providing specific jurisdiction over cases that "arise out of" a defendant's forum contacts, that the statute "does not require a causal connection between the defendant's forum-directed activities and the plaintiffs' lawsuit").[21] But we think the New York Court of Appeals is in a better position to respond to that question than are we.

### b. What is a "claim" for purposes of N.Y. C.P.L.R. § 302(a)(1)?

Further complicating the analysis is a lack of clarity regarding what must "aris[e] from" a defendant's New York contacts. Although it is well-established that the nexus inquiry requires us to decide whether "there is a substantial

---

[21] Complicating matters, an approach has begun to emerge in the federal district courts that a plaintiff's claim may only arise from a defendant's use of a correspondent banking account in New York where the defendant's use of such an account was "clearly 'at the very root' of the action." <u>Tamam</u>, 677 F. Supp. 2d at 727-29; <u>see also</u> <u>Licci</u>, 704 F. Supp. 2d at 407; <u>Daventree</u>, 349 F. Supp. 2d at 762; <u>Correspondent Servs. Corp.</u>, 120 F. Supp. 2d at 405. It is not clear to us whether this "very root of the action" formulation is consistent with the constructions of the nexus requirement under N.Y. C.P.L.R. § 302(a)(1) elaborated by <u>Kreutter</u> and <u>McGowan</u>.

It also remains unclear whether it is possible that a plaintiff's cause of action might bear an "articulable nexus" but not a "substantial relationship" (or vice versa) to a defendant's New York-based contacts. <u>Cf.</u> <u>Helicopteros</u>, 466 U.S. at 415 n.10 (reserving the question "whether the terms 'arising out of' and 'related to' describe different connections between a cause of action and a defendant's contacts with a forum").

relationship between the transaction and the claim asserted," Kreutter, 71 N.Y.2d at 467, 527 N.Y.S.2d at 198, 522 N.E.2d at 43 (emphasis added), it is not clear whether the plaintiffs' "claim" is to be understood more loosely as the factual circumstances surrounding the harm suffered by a plaintiff, or more strictly as the doctrinal elements of a particular theory of recovery. Cf., e.g., Agency Rent A Car System, Inc. v. Grand Rent A Car Corp., 98 F.3d 25, 31 (2d Cir. 1996) (comparing the elements of plaintiff's cause of action to defendant's forum contacts). And if a "claim" refers to the elements of a cause of action, it is unclear whether the relevant element here is the plaintiffs' "injuries" or the defendant's wrongful act (referred to in the tort context as a "breach of duty") -- or perhaps both. See, e.g., Consol. Rail Corp. v. Gottshall, 512 U.S. 532, 550-51 (1994) (noting that "traditional tort concepts" include "injury" and "breach of duty"). In other words, for sufficient nexus to exist, must the plaintiffs' injuries -- the deaths and injuries in Israel -- "aris[e] from" the defendant's use of a New York correspondent bank account, or must the defendant's alleged wrongful act -- LCB's transfer of funds -- "aris[e] from" the use of that account?[22] This distinction is of potential

_____

[22] Some cases have placed a greater emphasis on the connection between the plaintiff's injury and the defendant's New

45

relevance because under plaintiffs' theory of recovery, the injury suffered is causally decoupled from the defendant's wrongful act,[23] and LCB's alleged wrongful act bears a closer relationship to its New York contacts than do the plaintiffs' injuries.  This ambiguity regarding the meaning of the term "claim" compounds the previously noted uncertainty as to the meaning of "substantial relationship" for purposes of N.Y. C.P.L.R. § 302(a)(1).

---

York contacts.  See Sole Resort, 450 F.3d at 104 (discussing the "nexus between the parties' New York contacts and the . . . event giving rise to the plaintiff's injury"); Holness v. Maritime Overseas Corp., 251 A.D.2d 220, 224, 676 N.Y.S.2d 540, 544 (1st Dep't 1998) ("[P]laintiff's alleged injury and the tort action based on it cannot be said to have arisen directly out of this . . . transaction . . . ."); Chamberlain v. Peak, 155 A.D.2d 768, 769, 547 N.Y.S.2d 706, 707 (3d Dep't 1989) ("[N.Y. C.P.L.R. § 302(a)(1)] requires an articulable nexus . . . between the New York activity . . . and the asserted claim and injury.").  Other cases have focused instead on the link between the defendant's breach of duty and its New York activities.  See Best Van Lines, 490 F.3d at 254 (discussing the "nexus  . . . between allegedly tortious conduct" and New York activity); Hoffritz for Cutlery, 763 F.2d at 60 (finding "a substantial nexus between these [New York] activities . . . and the alleged breach of the franchise agreement"); Hugeclick.com, Inc. v. Vanderpol, No. 00 Civ. 1976, 2001 WL 170803, at *2, 2001 U.S. Dist. LEXIS 1619, at *4-*5 (S.D.N.Y. Feb 21, 2001) ("[T]here is a 'substantial relationship' between these activities and defendant's alleged torts and other breaches of duty . . . .").

[23] See Pls.' Br. at 21 ("[A] [section] 2333 plaintiff need only show that the defendant knowingly gave material support to the terrorist group that harmed him, and need not allege or prove that the specific material support provided by the defendant caused the harm." (citing Boim II, 594 F.3d at 695-700)).

To be sure, there have been several relatively recent decisions by the New York Court of Appeals and by our Court applying the nexus requirement. These decisions, however, have generally undertaken fact-bound analyses that shed little light on how the nexus requirement should be applied in the instant case.[24] In light of the foregoing, we cannot confidently say whether the New York Court of Appeals would conclude that the

---

[24] See, e.g., Sole Resort, 450 F.3d at 104 (nexus requirement satisfied, in petitioner's action to vacate an arbitral award, where respondent had New York contacts "underlying [the] contract that [had] provide[d] for [the] arbitration"); Grand River Enters. Six Nations, Ltd. v. Pryor, 425 F.3d 158, 167 (2d Cir. 2005) (nexus requirement satisfied, in plaintiff's antitrust suit, where parties had negotiated and signed relevant contract in New York), cert. denied, 549 U.S. 951 (2006); Kronisch v. United States, 150 F.3d 112, 130-32 (2d Cir. 1998) (nexus requirement satisfied, in plaintiff's Bivens action, where defendant drugged plaintiff in Paris but regularly visited New York in connection with clandestine LSD-testing scheme); Fischbarg, 9 N.Y.3d at 384, 849 N.Y.S.2d at 508-09, 880 N.E.2d at 29-30 (nexus requirement satisfied, in plaintiff's action to recover legal fees accrued, where defendants solicited plaintiff in New York to perform legal services in Oregon); Johnson, 4 N.Y.3d at 520, 797 N.Y.S.2d at 35, 829 N.E.2d at 1203 (nexus requirement not satisfied because "[p]laintiffs' cause of action arose out of defendant's allegedly negligent driving in New Jersey, not from the issuance of a New York driver's license or vehicle registration [to the defendant]"); see also Copp v. Ramirez, 62 A.D.3d 23, 30, 874 N.Y.S.2d 52, 58-59 (1st Dep't 2009) (nexus requirement not satisfied, in defamation action, where defamatory statements were made in New Mexico concerning events in New York that defendants had witnessed during a one-day visit to New York three years prior); Opticare Acquisition Corp. v. Castillo, 25 A.D.3d 238, 246-47, 806 N.Y.S.2d 84, 91 (2d Dep't 2005) (nexus requirement satisfied, in plaintiff's contract and misappropriation action, where contracts were executed and other business activities were transacted in New York).

47

plaintiffs have demonstrated an "articulable nexus" or "substantial relationship" on these facts.

        2.   <u>The ATS and Israeli-Law Claims</u>.  The Canadian and Israeli plaintiffs bring claims against LCB under the ATS. The plaintiffs also assert claims against LCB under Israeli law for negligence and breach of statutory duty.  LCB moved pursuant to Rule 12(b)(6) to dismiss each of these claims as insufficient as a matter of law.[25]  The district court did not reach their merits, dismissing them on jurisdictional grounds alone.  Therefore, as with the Anti-Terrorism Act claims, we ask only whether those claims bear an "articulable nexus" to, or a "substantial relationship" with, the business allegedly transacted by LCB in New York.  <u>Best Van Lines</u>, 490 F.3d at 246 (internal quotation marks omitted).  For the reasons already discussed with respect to the plaintiffs' Anti-Terrorism Act claims, however, we find that inquiry difficult.

     It must be noted that under the current law of this Circuit, as established after the district court decided this

---

[25] Before the district court, LCB did not express a view as to whether New York or Israeli law governed the plaintiffs' tort claims, but instead argued that the claims would fail regardless of which law governs.  The district court, in dismissing these claims for lack of personal jurisdiction, did not reach the choice-of-law question, and the parties have not briefed it on appeal.  Therefore, insofar as we refer to these claims as "Israeli law" claims, we do not intend to signal any view regarding the choice-of-law question.

case, the ATS claims against LCB cannot be maintained in any event because the ATS does not provide subject matter jurisdiction to enable us to entertain civil actions against corporations for violations of customary international law. Kiobel v. Royal Dutch Petro. Co., 621 F.3d 111 (2d Cir. 2010), cert. granted, 132 S. Ct. 472 (2011). Based on the imminence of the Supreme Court's review of Kiobel, however, and the fact that the jurisdictional inquiry applicable to all of plaintiffs' claims appears to be similar, we reserve decision as to the ATS claims. We think it the more prudent course to allow the Court of Appeals first to address whether personal jurisdiction exists over each of the plaintiffs' claims, including the ATS claim.

Should the Supreme Court reverse our decision in Kiobel, and the Court of Appeals decision (if any) indicate that we have personal jurisdiction over LCB in this case, the ATS claims will likely require further proceedings in the district court. If the Supreme Court affirms in Kiobel or the Court of Appeals indicates that we do not have personal jurisdiction over LCB, we will likely be required to affirm the dismissal of the ATS claims against it on either or both grounds. We will therefore await the decisions of one or both of those courts before reaching a conclusion as to the ATS claims against LCB.

49

* * *

In light of the foregoing, we certify the following second question to the Court of Appeals:

> (2) Do the plaintiffs' claims under the Anti-Terrorism Act, the ATS, or for negligence or breach of statutory duty in violation of Israeli law, "aris[e] from" LCB's transaction of business in New York within the meaning of N.Y. C.P.L.R. § 302(a)(1)?

IV.   Certification

The rules of this Court provide that "[i]f state law permits, the court may certify a question of state law to that state's highest court."  2d Cir. Local R. 27.2(a); see also Am. Buddha, 609 F.3d at 41–42.  Although the parties have not requested certification, we are empowered to pursue it on our own motion.  See 10 Ellicott Square Court Corp. v. Mtn. Valley Indem. Co., 634 F.3d 112, 125 (2d Cir. 2011); Kuhne v. Cohen & Slamowitz, LLP, 579 F.3d 189, 198 (2d Cir. 2009).  Our decision whether to certify is discretionary.  Am. Buddha, 609 F.3d at 41.  In determining whether to pursue it, we are guided principally by three factors.

First, "certification may be appropriate if the New York Court of Appeals has not squarely addressed an issue and other decisions by New York courts are insufficient to predict how the Court of Appeals would resolve it."  Id. at 42; see

50

also 10 Ellicott Square Court Corp., 634 F.3d at 125-26 (collecting cases); N.Y. Comp. Codes R. & Regs. tit. 22, § 500.27(a).  Second, "the question on which we certify must be of importance to the state," 10 Ellicott Square Court Corp., 634 F.3d at 126 (internal quotation marks and ellipsis omitted), and "its resolution must 'require[] value judgments and important public policy choices that the New York Court of Appeals is better situated than we to make,'" id. (quoting Am. Buddha, 609 F.3d at 42).  Third, "we may certify if the question is 'determinative' of a claim before us."  Id. (citing N.Y. Comp. Codes R. & Regs. tit. 22, § 500.27(a)) (other internal quotation marks omitted); see also O'Mara v. Town of Wappinger, 485 F.3d 693, 698 (2d Cir. 2007).

Although we need not certify if we are confident that we can correctly resolve the matter at issue ourselves, see, e.g., Best Van Lines, 490 F.3d at 242 n.3, we conclude that the standards for certification are met in the case before us. First, the New York Court of Appeals does not appear to have squarely addressed the jurisdictional questions presented by this case, and we conclude that the decisions of other New York state courts do not enable us to predict with confidence how the Court of Appeals would resolve them.  Second, determining the scope of the New York long-arm statute is -- as we have previously noted in certifying other jurisdictional questions,

51

see, e.g., Am. Buddha, 609 F.3d at 32 -- a task that requires the exercise of "value judgments and important public policy choices," 10 Ellicott Square Court Corp., 634 F.3d at 126, best left to New York's highest court, if possible.  Finally, the answers to these questions will be determinative if the Court of Appeals decides that long-arm jurisdiction is lacking in this instance, as all of the plaintiffs' claims against LCB would have to be dismissed.

Accordingly, we certify to the New York Court of Appeals the following two questions:

> (1) Does a foreign bank's maintenance of a correspondent bank account at a financial institution in New York, and use of that account to effect "dozens" of wire transfers on behalf of a foreign client, constitute a "transact[ion]" of business in New York within the meaning of N.Y. C.P.L.R. § 302(a)(1)?
>
> (2) If so, do the plaintiffs' claims under the Anti-Terrorism Act, the ATS, or for negligence or breach of statutory duty in violation of Israeli law, "aris[e] from" LCB's transaction of business in New York within the meaning of N.Y. C.P.L.R. § 302(a)(1)?

"As is our practice, we do not intend to limit the scope of the Court of Appeals' analysis through the formulation of our question[s], and we invite the Court of Appeals to expand upon or alter th[ese] question[s] as it should deem appropriate."  10 Ellicott Square Court Corp., 634 F.3d at 126.

## V. Constitutional Due Process Limits to Personal Jurisdiction

For personal jurisdiction over LCB to be permissible, federal constitutional due process standards must also be satisfied. See Chloé, 616 F.3d at 164 ("If the long-arm statute permits personal jurisdiction, the second step is to analyze whether personal jurisdiction comports with the Due Process Clause of the United States Constitution."); accord LaMarca v. Pak-Mor Mfg. Co., 95 N.Y.2d 210, 216, 713 N.Y.S.2d 304, 308, 735 N.E.2d 883, 887 (2000). But see D.H. Blair & Co. v. Gottdiener, 462 F.3d 95, 105 (2d Cir. 2006) (suggesting that the application of section 302(a) automatically "meets [constitutional] due process requirements"). Because the district court determined that exercising personal jurisdiction was not authorized by the New York long-arm statute, it was not required to reach the question of whether exercising jurisdiction would comport with the Due Process Clause. Nonetheless, the district court concluded similarly that "[t]he exercise of personal jurisdiction over LCB on the basis alleged by plaintiffs would not comport with constitutional principles of due process." Licci, 704 F. Supp. 2d at 408.[26] We reserve

_____

[26] On appeal, the plaintiffs do not expressly challenge that conclusion. Under the circumstances, however, and in light of the substantial similarity between the statutory and constitutional inquiries, we do not think that the plaintiffs have forfeited their argument in this respect -- nor does LCB

decision on this issue.  We will address it, if necessary, when this case returns to us following the New York Court of Appeals' disposition of our certification request.  <u>See</u> <u>Ehrenfeld</u>, 489 F.3d at 547.  Accordingly, nothing in this opinion is intended, or should be read, to indicate our view as to whether jurisdiction in this case would pass Fourteenth Amendment muster.

**CONCLUSION**

For the foregoing reasons and pursuant to New York Court of Appeals Rule 500.27 and Local Rule 27.2 of this court, we certify the following two questions to the New York Court of Appeals:

(1) Does a foreign bank's maintenance of a correspondent bank account at a financial institution in New York, and use of that account to effect "dozens" of multimillion dollar wire transfers on behalf of a foreign client, constitute a "transact[ion]" of business in New York within the meaning of N.Y. C.P.L.R. § 302(a)(1)?

(2) If so, do the plaintiffs' claims under the Anti-Terrorism Act, the ATS, or for negligence or breach of statutory duty in violation of Israeli law, "aris[e] from" LCB's transaction of business in New York within the meaning of N.Y. C.P.L.R. § 302(a)(1)?

---

argue that they have.

54

It is hereby ORDERED that the Clerk of this Court transmit to the Clerk of the New York Court of Appeals this opinion as our certificate, together with a complete set of the briefs, the appendix, and the record filed in this Court by the parties. The parties shall bear equally any fees and costs that may be imposed by the New York Court of Appeals in connection with this certification. This panel will resume its consideration of this appeal after the disposition of this certification by the New York Court of Appeals.