13-4066(L)

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2014

(Argued:  October 6, 2014      Decided:  May 19, 2015)

Docket Nos. 13-4066, 13-4310

———————————————

Beck Chevrolet Co., Inc.,

Plaintiff–Appellant-Cross-Appellee,

v.

General Motors LLC,

Defendant–Appellee-Cross-Appellant.

———————————————

Before:        SACK, LIVINGSTON, and LOHIER, *Circuit Judges*.

The plaintiff, a motor vehicle dealer, appeals from a July 13, 2012, order granting summary judgment to the defendant, a motor vehicle manufacturer, and a September 30, 2013, final judgment denying the plaintiff's two remaining claims for injunctive relief, entered in the United States District Court for the Southern District of New York (Alvin K. Hellerstein, *Judge*).  The plaintiff's contract and New York Dealer Act claims arise principally out of a dispute over the defendant's performance standards, vehicle allocation system, and alleged unlawful modification of its franchise agreement with the plaintiff.  We conclude that New York state law is insufficiently developed for us to ascertain its proper

interpretation in the context of several issues raised on this appeal, and that questions as to what the applicable laws require should therefore be certified to the New York Court of Appeals.  We further conclude that the district court did not err in dismissing the plaintiff's vehicle allocation claim, denying the plaintiff's request for attorney's fees, or dismissing the defendant's counterclaim for rescission.

We therefore AFFIRM in part and CERTIFY the remaining questions to the New York Court of Appeals.

RUSSELL P. MCRORY, Arent Fox LLP, New York, NY, *for Plaintiff–Appellant-Cross-Appellee.*

JAMES C. MCGRATH, Seyfarth Shaw LLP, (Christina Chan, Bingham McCutchen LLP, *on the brief*), Boston, MA, *for Defendant–Appellee-Cross-Appellant*.

SACK, *Circuit Judge*:

This appeal requires us to address, apparently for the first time, several provisions contained in New York's Franchised Motor Vehicle Dealer Act (the "Dealer Act"), codified at New York Vehicle and Traffic Law sections 460 – 473. The plaintiff, Beck Chevrolet Co., Inc., is the proprietor of a Chevrolet dealership of the same name (the corporation and dealership are referred to hereinafter collectively as "Beck.").  Beck brought suit against its franchisor, General Motors,

LLC ("GM"), for claims arising under the Dealer Act, and state contract law claims, for imposition of unfair and unreasonable performance standards, unfair modification of the franchise agreement, and refusal to deliver vehicles. The district court (Alvin K. Hellerstein, *Judge*), granted GM's motion for summary judgment with respect to the claims in Beck's first amended complaint, but granted it leave to assert two claims for injunctive and declaratory relief under the Dealer Act, sections 463(2)(c) and (gg). Following a bench trial, the district court dismissed the second amended complaint and GM's counterclaim for rescission of the franchise agreement. It also denied each party's application for attorney's fees.

Several of the issues we must consider in order to resolve this appeal require that we address unsettled questions of New York law. Beck challenges the district court's rulings that GM's performance metrics are neither unfair nor unreasonable and that GM's expansion of Beck's sales area did not constitute a "modification" of its Franchise Agreement under section 463 of the Dealer Act. We conclude that New York state law is insufficiently developed in these areas to enable us to predict with confidence how the New York Court of Appeals would resolve these questions. We therefore certify to the Court of Appeals two

questions concerning the application of the Dealer Act. We affirm the district court's dismissal of Beck's claims for attorney's fees and unfair allocation of vehicles, and GM's counterclaim for rescission of the Participation Agreement.

## BACKGROUND

Beck, located in Yonkers, New York, is a retail dealer in Chevrolet automobiles. It is operated under a set of franchise agreements entered into with the defendant, GM, which is a limited liability company whose sole member is a citizen of Delaware with its principal place of business in Michigan.

In 2009, General Motors Corp. ("Old GM") entered into widely reported bankruptcy proceedings in the United States Bankruptcy Court for the Southern District of New York. In the course of those proceedings, Old GM, the defendant GM's predecessor corporation, sought to shrink its dealer network in an effort to reduce competition among retail dealers in General Motors automobiles and improve the profitability of the remaining individual franchises.

As part of this effort, Old GM offered two types of agreements to its franchisees. Some were offered a Participation Agreement, under which their franchises would continue, while others were offered a Wind-Down Agreement, under which their franchises would be terminated in exchange for cash

4

payments to them. Beck initially executed a Wind-Down Agreement in which it agreed to terminate its operations in or before October 2010 in exchange for a payment to Beck of approximately $390,000.

Old GM subsequently sold substantially all of its assets and assigned its interest in all its Participation and Wind-Down Agreements with franchisees to GM, the defendant in this case. Beck asked GM to reconsider Old GM's decision to terminate the franchise. GM agreed to offer Beck a Participation Agreement in place of the Wind-Down Agreement. The parties executed that agreement in September 2009.

From that point on, two contracts governed Beck's relationship with GM: a Dealer Sales and Services Agreement (the "Dealer Agreement"), which contains standard provisions that set out the basic terms of the relationship between GM and any dealer franchise, and a September 2009 Participation Agreement, which further modified and supplemented the basic Dealer Agreement. Together, these agreements govern several issues central to this dispute, including Beck's primary geographic area of responsibility and the performance standards to which it is subject. The terms of these agreements are all subject to the Dealer

5

Act, which also contains certain mandatory provisions governing the manufacturer-franchisee relationship.

*Performance Monitoring Formula*

The primary issue on appeal relates to GM's use of a Retail Sales Index ("RSI") to measure its dealers' sales performance. In arriving at the RSI value for a particular dealership, GM assigns each dealer an "Area of Primary Responsibility" and, in some instances, an "Area of Geographic Sales and Service Advantage" ("AGSSA"). An Area of Primary Responsibility is a geographic area in which a dealer is expected to sell GM automobiles and otherwise represent GM. Urban Areas of Primary Responsibility, such as the part of Westchester County, New York, in which Beck is located, are typically served by more than one GM dealer. GM accordingly subdivides those areas into AGSSAs, for each of which a single dealer is responsible. Both the Areas of Primary Responsibility and the AGSSAs are composed of census tracts drawn by the U.S. Census Bureau.[1] AGSSAs and Areas of Primary Responsibility are non-exclusive –

---

[1] According to the United States Census Bureau,

Census Tracts are small, relatively permanent statistical subdivisions of a county or equivalent entity that are updated by local participants prior to each decennial census as part of the Census Bureau's Participant Statistical Areas Program. The Census Bureau delineates census tracts in situations where no local participant existed or where state, local, or tribal

dealers are allowed to sell and market vehicles to consumers outside of their own AGSSAs. The function of these territory markers is not to protect dealers from competition but to provide a benchmark against which GM can measure dealers' sales.

In determining an RSI for a Chevrolet dealer such as Beck, GM divides the dealer's actual retail sales by its expected sales, which are calculated as described below. Expressed as a formula:

$$\frac{\text{Dealer's Total Sales}}{\text{Expected Sales Based on State Average}} \times 100 \quad = \quad \text{RSI}$$

Dealers are required to attain an RSI of at least 100, which GM contends is an "average" score.[2] "Total sales" measures all of a particular dealer's actual sales in

---

governments declined to participate. The primary purpose of census tracts is to provide a stable set of geographic units for the presentation of statistical data.

*Geographic Terms and Concepts – Census Tract*, U.S. Census Bureau, http://www.census.gov/geo/reference/gtc/gtc_ct.html (last visited Apr. 20, 2015).

[2] We refer to this rather imprecisely as an "average" score because it reflects the requirement that each dealer's market share equal GM's average statewide market share. Unless all dealers attain the exact same market share, one would expect a substantial number of dealers to score higher than average each year. It necessarily

a particular period of time. The "expected sales" metric is based not on the raw state average among dealers, but on an "adjusted" statewide average market share for Chevrolet products in the dealer's AGSSA.[3]

GM calculates each dealer's expected sales by first taking into account all new motor vehicle registrations in the United States. It then compiles the registrations by census tract and subdivides them into "segments" of the motor vehicle market, based on types of automobiles. To choose two examples, small sport utility vehicles are a segment, as are mid-size sedans.

GM adjusts the expected sales figure for statewide and local characteristics. First, it takes into account Chevrolet's market share within the segments in which it competes on a statewide basis. For example, because Chevrolet does not compete in the luxury sedan segment of the market, that segment is excluded when calculating Chevrolet's statewide market share. Chevrolet does compete in the markets for mid-size sedans and pickup trucks, however. If, hypothetically, there are 10,000 mid-size sedans sold in New York

---

follows that a substantial number will fall short, as well. And as dealer performance improves, the sales required to achieve an RSI of 100 will increase.

[3] GM has used a weighted statewide average since 1999, when it switched from using a national average. GM's method is thus in keeping with the industry standard; the vast majority of GM's competitors use a statewide or regional average, and some still compare their dealers' performance to a national average.

State and 600 of those are Chevrolets, Chevrolet will have a 6 percent market share in New York State among mid-size sedans.  If there are 20,000 pickup trucks sold in New York State, and 5,000 of those are Chevrolets, Chevrolet will have a 25 percent market share in New York State among pickup trucks.

Second, the expected sales figure takes into account the relative popularity of a particular segment in the dealer's AGSSA.  In other words, the market-share percentages described above are used to calculate each dealer's expected sales.  If Chevrolet is a particularly strong statewide competitor in the market for a particular type of car – pickup trucks, for example – but the market for pickup trucks in a particular (likely urban or suburban) AGSSA is relatively small, then the dealership's expected sales targets for pickup trucks would be relatively low.  For example, a Chevrolet dealer in an AGSSA in which only four total pickup trucks are purchased in a given year would be expected to sell only one Chevrolet pickup truck, while a dealer in an AGSSA in which 100 pickup trucks are purchased in a given year would be expected to sell twenty-five.  GM asserts that these segment-based adjustments reduced Beck's targets by more than twenty-five percent from the unadjusted state average.  Beck does not contend otherwise.

Local adjustments do not account for local brand popularity, however. For example, dealers like Beck operating in the southern part of the state ("downstate") do not receive a downward adjustment in sales expectations even though Chevrolet, as a brand, is more popular in upstate markets than in Yonkers, Beck's location, and elsewhere in Westchester County and some nearby suburban counties.

*Beck's Performance under the Current RSI Formula*

The Dealer Agreement establishes the basic outlines of GM's performance evaluation process. Specifically, it provides that a dealer's RSI is "satisfactory" only if it is equal to or greater than 100. If the dealer's RSI is above 100 and in the top fifteen percent statewide, it is classified by GM as "superior."

If performance falls below satisfactory, GM is authorized by the Participation Agreement to take one or more remedial measures set forth in Article 13.2 of the Dealer Agreement. The ultimate step possible in this process is termination of the agreement on ninety days' prior written notice. The Participation Agreement further provides:

> In addition to the [RSI, GM] will consider any other relevant factors
> in deciding whether to proceed under the provisions of Article 13.2
> to address any failure by Dealer to adequately perform its sales
> responsibilities. [GM] will only pursue its rights under Article 13.2

10

to address any failure by Dealer to adequately perform its sales responsibilities if [GM] determines that Dealer has materially breached its sales performance obligations under this Dealer Agreement.

J.A. 157.  According to GM, GM prefers not to terminate dealers who fall below target levels, and has remedial programs to help improve performance at those dealerships.

Beck's RSI was considerably lower than 100 in the years leading up to GM's 2009 bankruptcy reorganization.  The Participation Agreement established a roadmap for improving Beck's performance in stages, requiring Beck to attain an RSI of 70 in 2010, 85 in 2011, and 100 in 2012.  But Beck's RSI fell far short of these targets, remaining close to 50 in each year.  GM ultimately waived the Participation Agreement's performance requirements for the 2010 calendar year, but began enforcing performance targets in 2011.

*Inventory Issues*

Beck asserts that many of its performance issues derived from its inability to obtain adequate inventory from GM.  GM uses a vehicle allocation system called "turn and earn," through which a dealer's allotted inventory is calculated as a function of past sales.  While Beck was operating under the Wind-Down Agreement, it was not permitted to place orders for new vehicle inventory with

GM. According to Beck, Beck's depressed inventory caused sales to slow. Beck argues that as a result of this slowdown, it could not order adequate inventory under the "turn and earn" process even after it entered into the Participation Agreement which permitted it to order vehicles from GM.

In an effort to boost sales, GM instituted a "special vehicle allocation process" that was in effect from October 2010 through January 2011. The program was designed to allow dealers to order more vehicles during those four months than the "turn and earn" program would have permitted. Despite its depressed inventory in the months leading up to the program's launch, Beck objected to the program as a "poison pill and recipe for disaster." Letter from Russell S. Geller, Vice President, Beck Chevrolet Co., Inc., to James W. Bunnell, General Manager—U.S. Sales operations, General Motors LLC (Oct. 11, 2010) (J.A. 185-86). The program, Beck asserted, would result "in the delivery of too many vehicles too quickly," and would overload Beck's facilities, imposing high additional costs. *Id.* The vehicles would be delivered in winter, an unpopular season for purchasing new cars in New York, and Beck would be unlikely to sell them in a timely fashion. Beck opted not to participate heavily in the allocation program, declining 661, or 87 percent, of the vehicles GM offered to it. GM

urged Beck to reconsider its approach in two letters sent in November 2010, but apparently to no avail.

After GM ended the program and resumed its ordinary "turn and earn" process, Beck started ordering more cars than GM allocated.  For example, in January 2011, while the special allocation was in effect, GM offered Beck 177 vehicles; Beck ordered only 31.  GM resumed its ordinary process in February 2011, at which point GM shipped only 18 vehicles.  Beck ordered 67.  This imbalance continued for the remainder of 2011, with Beck ordering between 22 and 84 vehicles each month, and GM shipping between 2 and 49 fewer vehicles than Beck had requested.  Although Beck sold fewer cars than it had in its inventory in 2011, Beck contends that it could have sold more had GM honored its requests for an additional 218 vehicles between February and December 2011.

### *Extension of the Participation Agreement*

As noted, Beck signed a Participation Agreement with GM in 2009.  But during 2010, Beck operated under a short-term Dealer Agreement, which was set to expire on April 30, 2011.  The parties anticipated renewing the Dealer Agreement only if Beck attained its 2010 performance target: an RSI of 70.  But, because of the allocation issues, GM waived the performance requirements for

2010. Attaining an RSI of 70 for 2010 was no longer a prerequisite to gaining an extension. Instead, GM sent Beck a letter on April 6, 2011, offering to extend the Dealer Agreement to April 30, 2012, and conditioning any further extension on Beck meeting specified conditions:

> If Dealer [Beck] meets its year end 2011 RSI and CSI ["Customer Satisfaction Index"] performance requirements under the Participation Agreement, and if Dealer is otherwise in compliance with its obligations under the Dealer Agreement, GM will then further extend the Dealer Agreement to April 30, 2013 to correspond with Dealer's year end 2012 RSI and CSI requirements.
> However, should Dealer not meet its 2011 Performance Requirements, or should Dealer otherwise not be in compliance with its obligations under the Dealer Agreement, GM shall have no obligation to extend the Dealer Agreement beyond April 30, 2012.

Letter from William P. Flook, Jr., Zone Manager, General Motors LLC, to Leon Geller, Dealer Operator, Beck Chevrolet Co., Inc. (Apr. 6, 2011) (J.A. 229). GM noted that Beck would be deemed to have accepted the offer simply by opening for business on May 1, 2011.

Beck considered this to be an unlawful modification of the terms of its franchise because it conditioned renewal on accepting new terms. Beck brought suit in Supreme Court, Westchester County in an effort, *inter alia*, to stop the

14

modification from going into effect.[4]  One day later, on April 28, 2011, GM sent a follow-up letter explaining that the April 6 letter was intended "solely to extend the Chevrolet Dealer Sales and Service Agreement to April 30, 2012," not to modify the terms of existing agreements, and that the agreements applicable between the parties would remain in full effect according to their terms.  Letter from William P. Flook, Jr., Zone Manager, General Motors LLC, to Leon Geller, Dealer Operator, Beck Chevrolet Co., Inc. (Apr. 28, 2011) (J.A. 232).

*Enlarging Beck's Market Area*

At about the same time, on April 22, 2011, GM informed Beck that based upon its review of its dealer network, GM had concluded that it should make changes to the Areas of Responsibility or AGSSAs for many GM dealerships. The letter, which stated that it was provided "pursuant to New York Vehicle & Traffic Law § 463(2)(ff)(1)," notified Beck that its AGSSA would be increased by four census tracts in Westchester and Fairfield Counties and reduced by seven census tracts in Bronx County.  Letter from William P. Flook, Jr., Zone Manager, General Motors LLC, to Russell S. Geller and Leon Geller, Dealer Operators, Beck

---

[4]  GM removed the case to federal court on April 28, 2011.  The removed action is the case before us on appeal.

Chevrolet Co., Inc. (Apr. 22, 2011) (J.A. 234). The practical effect of this change was to increase Beck's expected sales.

### *Procedural History*

On April 27, 2011, as noted, Beck brought suit against GM in New York State court alleging violations of the New York Dealer Act for, *inter alia*, modifying the franchise agreement without due cause, applying arbitrary or unfair sales performance standards, refusing to deliver vehicles, and unlawful nonrenewal of the franchise, as well as claims for breach of the Dealer Agreement, and breach of GM's fiduciary duties. Based on the diversity of citizenship of the parties, GM removed the case to the United States District Court for the Southern District of New York. Following Beck's filing of an amended complaint, GM moved for summary judgment. The district court granted GM's motion on July 13, 2012, dismissing Beck's first amended complaint in its entirety. Beck subsequently filed a second amended complaint, seeking declaratory and injunctive relief on two of its Dealer Act claims. GM counterclaimed for rescission of the Participation Agreement.

Following a September 2013 bench trial, the district court ruled in GM's favor on the claims in Beck's second amended complaint, denied both parties'

applications for attorney's fees, and dismissed GM's counterclaim as moot and legally insufficient.  Beck, on appeal, challenges most of the district court's rulings against it, and GM cross-appeals from the dismissal of its claim for rescission.

While this case was pending in the district court, GM sought to terminate Beck's franchise agreement.  Beck initiated state administrative proceedings challenging the termination.  On the same day that we heard oral argument in this appeal, the administrative court ruled that GM's statewide RSI standard was unreasonable as to downstate Chevrolet dealers and that GM had therefore failed to demonstrate due cause to terminate Beck's franchise agreement.  *Beck Chevrolet Co., Inc. v. Gen. Motors LLC*, No. FMD 2013-02 (N.Y. Dep't of Motor Veh. Oct. 6, 2014).

## DISCUSSION

Beck argues that:  first, GM's method of calculating RSI is not fair or reasonable under Dealer Act section 463(2)(gg) because it does not account for local brand preferences; second, GM's expansion of Beck's AGSSA constituted a modification of Beck's franchise in violation of Dealer Act section 463(2)(ff); third, GM violated Dealer Act section 463(2)(a) by refusing to deliver all of the

inventory Beck ordered; and fourth, Beck was the prevailing party on its price discrimination and unlawful modification claims and therefore is entitled to attorney's fees.[5] GM also appeals from the district court's dismissal of its counterclaim for rescission of the Participation Agreement. Finally, both sides challenge some of the district court's evidentiary rulings.

### I.    Standard of Review

"On appeal from a bench trial, the district court's findings of fact are reviewed for clear error and its conclusions of law are reviewed *de novo*." *Mobil Shipping & Transp. Co. v. Wonsild Liquid Carriers Ltd.*, 190 F.3d 64, 67 (2d Cir. 1999). The application of law to undisputed facts is also subject to *de novo* review, *Deegan v. City of Ithaca*, 444 F.3d 135, 141 (2d Cir. 2006), as are mixed questions of law and fact, *Man Ferrostaal, Inc. v. M/V Akili*, 704 F.3d 77, 82 (2d Cir. 2012).

To the extent that Beck also appeals from the district court's dismissal of its first amended complaint, we review that summary judgment award *de novo*, "construing the evidence in the light most favorable to the non-moving party.

---

[5] To the extent that Beck intended to pursue its contract claim against GM for "sabotaging Beck's reputation and its ability to increase its sales," Beck Br. at 2-3, it has "abandoned . . . [that] claim[] by failing to give [it] more than cursory treatment in its brief on appeal." *Giuffre Hyundai, Ltd. v. Hyundai Motor Am.*, 756 F.3d 204, 207 n.2 (2d Cir. 2014).

We will affirm . . . only where there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law." *Lynch v. City of New York*, 737 F.3d 150, 156 (2d Cir. 2013) (citation omitted).

## II.    Reasonableness of GM's Performance Metrics

Beck's primary contention on appeal is that GM's performance standards are "unreasonable, arbitrary or unfair" under Dealer Act section 463(2)(gg).  The district court granted GM's motion for summary judgment on Beck's claim for damages under that section and, following a bench trial, ruled in GM's favor on Beck's request for injunctive relief.  Beck contends that the district court erred in reading an "egregiousness" requirement into the Dealer Act, misread relevant case law, and improperly constrained Beck's ability to present its case.

Insofar as we and the parties can determine, neither the New York Court of Appeals nor the Appellate Division of the New York Supreme Court has interpreted section 463(2)(gg)'s prohibition of "unreasonable, arbitrary or unfair sales or other performance standard[s]."  The parties therefore rely principally on legislative history, administrative decisions, and several out-of-state cases interpreting more or less similar state laws.

We look to the Dealer Act's legislative history primarily in an effort to understand the scope of judicial involvement in overseeing franchisor/franchisee relationships that the New York State legislature envisioned. Unfortunately, the legislative history is largely inconclusive on this point. There is support for both the position that the state legislature intended the courts to correct unequal bargaining power and cabin franchisors' ability to impose conditions on dealers and the position that it simply intended to protect franchisees against arbitrariness and gross injustice.

The Dealer Act was passed in 1983 in order to "promote the public interest and the public welfare" by

> regulat[ing] motor vehicle manufacturers, distributors
> and factory or distributor representatives and . . .
> dealers of motor vehicles doing business in this state in
> order to prevent frauds, impositions and other abuses
> upon its citizens and to protect and preserve the
> investments and properties of the citizens of this state.

N.Y. Veh. & Traf. Law § 460. Beck argues that the legislature further intended to "establish an equilibrium of bargaining power between the motor vehicle manufacturer and the motor vehicle dealer." Assembly Mem. in Support, Bill Jacket, L.1983, ch. 815, at 6. Establishing equilibrium was apparently thought necessary in light of the "great disparity in bargaining power between motor

vehicle manufacturer and motor vehicle dealer." *Id.* The bill therefore sought "to provide certain basic protections for the dealer in areas where such protection [wa]s deemed necessary." *Id.*

Section 463(2)(gg), added by amendment in 2008, established new dealer protection, making it unlawful for a franchisor "[t]o use an unreasonable, arbitrary or unfair sales or other performance standard in determining a franchised motor vehicle dealer's compliance with a franchise agreement." The parties disagree about the proper reading of this provision. Beck contends that a performance standard that fails to take into account external forces that affect dealers' performances, such as local brand preferences, is unreasonable. GM argues that only unjust, deceptive, irrational, or capricious standards run afoul of section 463's protections, and that its requirements are none of those.

More specifically, Beck contends that the district court erroneously read an "egregiousness" requirement into section 463(2)(gg), under which a court will reverse only egregious or deceptive decisions of the franchisor. The district court expressed agreement with the First Circuit's position in *Coady Corp. v. Toyota Motor Distributors, Inc.*, 361 F.3d 50 (1st Cir. 2004), interpreting the Massachusetts "Dealer's Bill of Rights," Mass. Gen. Laws ch. 93B, that "[a] distributor acting

21

honestly is entitled to latitude in making commercial judgments[,] and . . . [i]n this context, it is only the egregious decision that should be labeled 'arbitrary' or 'unfair.'" *Coady Corp.*, 361 F.3d at 56. Chapter 93B forbade "arbitrary or unfair" modifications to franchise agreements. *See id.* at 55. The court reasoned that the applicable Massachusetts provision did "not demand perfection in allocation or warrant a substitution of judicial for business judgment." *Id*. at 56. Instead, the "egregiousness" standard imposed by the law is highly deferential to the franchisor. *See id.*

Beck contends that it was inappropriate for the district court to adopt that interpretation of section 463(2)(gg). The New York provision, Beck argues, casts "a wide net," forbidding not only arbitrary standards but also unreasonable ones. Beck Reply Br. at 6. It is possible that the inclusion of "unreasonable" in section 463(2)(gg) is meant to signify a higher bar for franchisors' actions than non-arbitrariness review. *See, e.g.*, N.Y. Stat. Law §§ 231-32 (instructing that each word in a statute should be given distinct effect according to its ordinary meaning). That reading might also comport with the law's general purpose to protect motor vehicle dealers "against the superior economic power of the franchisors." *Bronx Auto Mall, Inc. v. Am. Honda Motor Co.*, 934 F. Supp. 596, 608

(S.D.N.Y. 1996), *aff'd on the opinion of the district court*, 113 F.3d 329, 330 (2d Cir. 1997) (per curiam).

It is not clear, however, that the 2008 amendment that created section 463(2)(gg) was intended to have such a broad effect. Some of the legislative history suggests that the legislature was primarily concerned with performance standards that were too confusing or too poorly communicated to be understood and followed by automobile dealers. *See* N.Y. Sponsor's Mem., Bill Jacket, 2008 S.B. 8678, ch. 490, at 13 (emphasizing that the amendment "brings more openness in dealer franchisor communications"); N.Y. Mem. in Support, Bill Jacket, 2008 S.B. 8678, ch. 490, at 42-44 (Mark Schienberg, President of the Greater New York Automobile Dealers Association, explained that section 463(2)(gg) will "prevent misunderstandings" and override performance standards that are too complicated and insufficiently communicated). It may be, then, that the statute was designed only to ensure that franchisors' performance standards are transparent and comprehensible, and that their substantive requirements are not egregious.

Assuming *arguendo* that Beck's reading of the statute is correct, we address its core contention that the statewide average GM uses to determine expected

sales is unreasonable for its failure to account for local variations in brand popularity. The relevant facts regarding this performance standard are essentially undisputed. First, GM's performance metric is based on a statewide sales average that does not account for depressed brand popularity, *i.e.*, the relative unpopularity of Chevrolet automobiles, in the relevant metro-area markets. Second, GM's metric does account for some local variation based on the popularity of a given vehicle segment, such as pickup trucks, small sport utility vehicles, and mid-size sedans. Third, under the relevant agreements, a failure to meet an RSI of 100 could result in GM's termination of the franchise or other remedial measures.

On these facts, the district court decided that the use of a statewide average was administratively convenient, objective, and easily understood, and that GM's formula adequately adjusted for local conditions through its segmentation analysis. The court appeared to adopt GM's contention that applying a more localized standard would "doom[] the entire make of Chevrolet vehicles to mediocrity" because it would not encourage better sales in underperforming areas. Trial Tr. at 669 (Sept. 24, 2013) (Special App'x 108). For these reasons, it concluded that the metric was reasonable.

The few reported decisions addressing performance standards have not adopted consistent interpretations of what is reasonable or acceptable. In a related context, the New York Department of Motor Vehicles recently determined that although Honda's use of statewide averages to gauge sales effectiveness was "not a perfect system," it was also not "patently unreasonable, arbitrary, or unfair." *Hartley Buick GMC Truck, Inc. v. Am. Honda Motor Co.*, No. FMD 2010-05 at 5, 8-9 (N.Y. Dep't of Motor Veh. Nov. 1, 2011), *aff'd*, No. 28447 (N.Y. Dep't of Motor Veh. Admin. App. Bd. Feb. 28, 2012).

Several other administrative courts have reached the opposite conclusion, however, rejecting statewide performance standards in favor of those that take local variations into account. Most relevant for present purposes, the Administrative Law Judge ("ALJ") who considered Beck's challenge to GM's notice of termination concluded that "[f]or the New York City metropolitan area, the RSI standard of GM is unreasonable" in part because "it does not realistically reflect the Chevrolet sales challenges that Beck and other New York metropolitan dealers face." *Beck Chevrolet Co., Inc. v. Gen. Motors LLC*, No. FMD 2013-02, at 9 (N.Y. Dep't of Motor Veh. Oct. 6, 2014). Although Beck has not argued that we

25

are bound by that decision,[6] our desire to avoid potentially inconsistent results in state, federal, and administrative courts in part motivates our decision to certify this issue to the New York Court of Appeals.

Beck also relies heavily on *North Shore, Inc. v. General Motors Corp.*, No. MVRB 79-01 (Ill. Mot. Veh. Rev. Bd. May 28, 2003), *aff'd in relevant part sub nom. General Motors Corp. v. Illinois Motor Vehicle Review Board*, 361 Ill. App. 3d 271, 836 N.E.2d 903 (2005), *aff'd*, 224 Ill. 2d 1, 862 N.E.2d 209, 308 Ill. Dec. 611 (2007), in which an Illinois ALJ resolved a challenge to GM's proposed addition of dealerships in the greater Chicago area. The ALJ concluded that measuring sales performance based on comparisons between similar market areas was preferable to using a statewide or nationwide standard. *See Gen. Motors Corp. v. State Motor Vehicle Review Bd.*, 224 Ill. 2d 1, 21-22, 862 N.E.2d 209, 223-24, 308 Ill. Dec. 611,

---

[6] Beck notified the court of the Department of Motor Vehicles' decision in a letter filed pursuant to Federal Rule of Appellate Procedure 28(j). It did not suggest that the administrative decision did or might have a preclusive effect on any aspect of this action and we accordingly consider the argument waived. We recognize, however, that if the issue of whether GM's RSI was reasonable was "necessarily raised and decided" by the Motor Vehicle Department, that determination could have preclusive effect here. *Ryan v. N.Y. Tel. Co.*, 62 N.Y.2d 494, 499-500, 467 N.E.2d 487, 489-90 (1984). Faced with a similar issue, however, the Department of Motor Vehicles concluded that the Southern District of New York's 2013 decision in this action had no preclusive effect on the dispute before it. *Beck Chevrolet*, No. FMD 2013-02, at 6 (deciding that "the issue of reasonableness of the RSI is not precluded by the Federal Court decision as the burden of proof in this proceeding has shifted from Beck to GM" and explaining differences in the evidence put forth and considered in the two actions).

625-26 (2007) (discussing the state motor vehicle review board's decision). Although not decided under the New York Dealer Act or a provision similar to its section 463(2)(gg), the Illinois courts expressly decided that a standard that takes local variations, such as import bias, into account is a "superior" method of determining performance. *Id.*

An administrative court in Texas reached the same conclusion in a similar case, reasoning that it was

> patently unfair to conclude that a standard is appropriate for comparison with a given market if most of the markets used in creating the standard are fundamentally dissimilar to the market at issue. Stated another way, [an] ALJ cannot endorse a process that characterizes a market as "underperforming" simply because it fails to meet a standard so profoundly influenced by markets bearing so little resemblance to the market in question.

*Landmark Chevrolet Corp. v. Gen. Motors Corp.*, No. 02-0002 LIC at 20-21 (Tex. Mot. Veh. Bd. Sept. 16, 2004), *aff'd sub nom. Austin Chevrolet, Inc. v. Motor Vehicle Bd.*, 212 S.W.3d 425 (Tex. App. 2006); *see also Halleen Chevrolet v. GMC*, No. 03-050MVDB-277-SS at 5 (Ohio Mot. Veh. Dealers Bd. July 21, 2006) (report and recommendation) ("[I]t is inappropriate to consider the expected Ohio average to an urban multi-dealer area such as the [designated area] in this case. Because

single market dealers in rural areas tend to achieve about the expected state average and the urban dealers tend to achieve below, it seems that the average is somewhat flawed in a case such as this.").

And the United States District Court for the Southern District of New York recently denied a defendant's motion to dismiss a similar claim under the New York Dealer Act. *See CMS Volkswagen Holdings, LLC v. Volkswagen Grp. of Am., Inc.*, 25 F. Supp. 3d 432, 441-42 (S.D.N.Y.), *reconsideration and reargument denied*, 2014 WL 4961769, 2014 U.S. Dist. LEXIS 141105 (S.D.N.Y. Oct. 3, 2014).

These decisions are, of course, not binding on us, but they are instructive. That several ALJs who routinely consider disputes between franchisors and franchisees have concluded that statewide averages are not reasonable performance indicators gives us pause. It seems sensible enough to conclude that car dealers located in different parts of a single state would face different barriers to success, including variations in local brand preferences. By failing to take this into account, the existing performance standards make it likely that that the lowest-performing dealers will be concentrated in the areas in which GM's brands are the weakest.

At the same time, however, section 463(2)(gg) does not mandate that franchisors impose individually tailored or perfectly just performance standards. It prohibits only performance standards that are "unreasonable, arbitrary or unfair." And, as the district court recognized, GM's performance standards have significant virtues, including ease of administration, predictability, uniformity, and encouragement of innovation in struggling markets. They give GM greater flexibility to demand changes or shut down unproductive dealerships. And, importantly, they appear to represent the industry standard.

Recognizing these competing considerations and the absence of existing guidance from the New York Court of Appeals, we think it best to certify the following question to it for its determination:

(1) Is a performance standard that requires "average" performance based on statewide sales data in order for an automobile dealer to retain its dealership "unreasonable, arbitrary, or unfair" under New York Vehicle & Traffic Law section 463(2)(gg) because it does not account for local variations beyond adjusting for the local popularity of general vehicle types?

### III. Modification of the Dealer Agreement

Beck also appeals from the district court's grant of summary judgment against it on its claim that changes to its AGSSA constituted an unfair

29

"modification" of its Dealer Agreement under section 463(2)(ff)(1)-(2) of the New York Vehicle & Traffic Law.  That subsection provides that it is

> unlawful for any franchisor, notwithstanding the terms of any franchise contract . . . [t]o modify the franchise of any franchised motor vehicle dealer unless the franchisor notifies the franchised motor vehicle dealer, in writing, of its intention to modify the franchise of such dealer at least ninety days before the effective date thereof, stating the specific grounds for such modification.

N.Y. Veh. & Traf. Law § 463(2)(ff)(1).  "Modification" is defined as "any change or replacement of any franchise if such change or replacement may substantially and adversely affect the new motor vehicle dealer's rights, obligations, investment or return on investment."  *Id.* § 463(2)(ff)(2).  Upon receiving notice of an intended modification, the franchisee may challenge the modification as unfair.  A modification is "unfair if it is not undertaken in good faith; is not undertaken for good cause; or would adversely and substantially alter the rights, obligations, investment or return on investment of the franchised motor vehicle dealer under an existing franchise agreement."  *Id.* § 463(2)(ff)(3).

The April 22, 2011, letter notifying Beck that GM had increased Beck's AGSSA by four census tracts stated that it was provided "pursuant to New York Vehicle & Traffic Law § 463(2)(ff)(1)."  Letter from William P. Flook, Jr., Zone

Manager, General Motors LLC, to Russell S. Geller and Leon Geller, Dealer Operators, Beck Chevrolet Co., Inc. (Apr. 22, 2011) (J.A. 234). Beck argues that GM thereby acknowledged that the revision constituted a "modification" under the Dealer Act for which GM failed to demonstrate good cause. The Dealer Agreement states, however, that GM "retains the right to revise the Dealer's Area of Primary Responsibility at General Motors['] sole discretion consistent with dealer network objectives." J.A. 143. If the agreement expressly reserves to GM the power to unilaterally revise the Area of Primary Responsibility, such a revision might not constitute a contract modification.

The district court concluded that the exercise of contractually conferred discretion generally does not constitute a modification of the contract. *See also, e.g.*, *Subaru Distribs. Corp. v. Subaru of Am., Inc.*, 47 F. Supp. 2d 451, 459 n.3 (S.D.N.Y. 1999) (periodic quota amendments contemplated by contract did not constitute amendments to dealer agreement); *In re Kerry Ford, Inc.*, 106 Ohio App. 3d 643, 651-52, 666 N.E.2d 1157, 1162-63 (1995) (use of service bulletins to provide updated service standards did not modify the contract where they were contemplated by the sales and service agreement). But we are not convinced that the Dealer Act contemplated that result. If the act was designed to protect

31

franchisees from manufacturers' disproportionate bargaining power, we might read section 463(2)(ff)(1) to proscribe contractual provisions that allow manufacturers to circumvent the Act's protections by retaining unilateral discretion to revise specified elements of the Dealer Agreement.

Moreover, under the Dealer Act, a modification is "any change . . . of any franchise if such change or replacement may substantially and adversely affect the new motor vehicle dealer's rights, obligations, investment or return on investment." N.Y. Veh. & Traf. Law § 463(2)(ff)(2). GM argues that the word "franchise" refers to the Dealer Agreement, and because a change to the AGSSA has no impact on the Dealer Agreement, a change to the AGSSA is not a modification. But the statute defines a "franchise" not in terms of a single agreement, but as a "written arrangement." N.Y. Veh. & Traf. Law § 462(6). This "arrangement" might extend beyond the Dealer Agreement to include secondary documents, including those defining Beck's AGSSA. Only one New York court has addressed this issue so far as we know, and it concluded that a change to the dealer's Area of Primary Responsibility does constitute a modification under section 463(2)(ff). *See Van Wie Chevrolet, Inc. v. Gen. Motors LLC*, No. 2012-0284 at 2-3 (N.Y. Sup. Ct. Onondaga Cnty. June 13, 2014).

On the other hand, if the Dealer Act was designed to do no more than ensure clarity in communications and negotiations between franchisor and franchisee, it most likely would not apply to GM's express reservation of the right to modify Beck's AGSSA. In the absence of any state appellate court decisions indicating how the New York Court of Appeals would rule on this issue, we also certify the following question for its determination:

> (2) Does a change to a franchisee's Area of Primary Responsibility or AGSSA constitute a prohibited "modification" to the franchise under section 463(2)(ff), even though the standard terms of the Dealer Agreement reserve the franchisor's right to alter the Area of Primary Responsibility or AGSSA in its sole discretion?

## IV. Vehicle Allocation

Beck next contends that the district court erred in granting summary judgment on its claim that GM wrongly refused to deliver requested vehicles. This claim also arises under the Dealer Act, but unlike the claims discussed above, we are confident that we can correctly resolve this question without certification to the New York Court of Appeals. *See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 74 (2d Cir. 2012) ("[W]e need not certify if we are confident that we can correctly resolve the matter at issue ourselves . . . .").

Under the Dealer Act, it is unlawful to "refuse to deliver in reasonable quantity and within a reasonable time after receipt of a dealer's order to any franchised motor vehicle dealer any vehicle covered by such franchise which is publicly advertised by such franchisor to be available for immediate delivery." N.Y. Veh. & Traf. Law § 463(2)(a). Although "[d]isputes over reasonableness are usually fact questions for juries," *Lennon v. Miller*, 66 F.3d 416, 421 (2d Cir. 1995), "[s]ummary judgment . . . is [] appropriate when the non-moving party has failed to set forth any facts that go to an essential element of the claim," *King v. Crossland Sav. Bank*, 111 F.3d 251, 259 (2d Cir. 1997).

Beck relies on an affidavit submitted by its vice-president to support its claim. We conclude that the uncontested facts asserted in it are insufficient to allow Beck to prevail. They establish only the following: Beck had low inventory entering 2010 as a result of having entered into the Wind-Down Agreement in 2009. Under that agreement, Beck was not allotted any new inventory. GM had a "turn and earn" vehicle allocation system by which dealers were allocated inventory based on prior sales. Beck argues that low inventory under the Wind-Down Agreement yielded low sales in 2009, which made it difficult to re-build its inventory after it signed the 2010 Participation Agreement.

34

Beck acknowledges, however, that it had sufficient inventory to meet demand at all times in 2010 and 2011 and that it refused cars offered to it. In 2010, for example, Beck received 358 vehicles and sold only 289, leaving 69 (plus any remaining inventory from 2009) unsold entering 2011. GM administered its special allocation program from October 2010 through January 2011, which would have enabled Beck to receive additional inventory each month. Beck acknowledges that it refused to take part in the program, arguing that it would have resulted in too much inventory during the low-sale winter months. But Beck's own ordering patterns appear to disprove Beck's explanation of the basis for its refusal to participate in the special allocation program. GM offered Beck 177 vehicles in January 2011. Beck ordered only 31, refusing the other 146. In the next two months, after the special allocation program had ended but still during winter, Beck ordered 151 cars – significantly more than its allocation. Beck offers no explanation for its refusal to take the 146 extra cars offered in January in light of its substantial order in the following two months. Moreover, Beck had more than adequate inventory to satisfy its 2011 sales of 347 cars.

On these facts, the district court properly determined that "the admissible evidence [wa]s insufficient to permit a rational juror to find in favor of the

plaintiff." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). Even if Beck could have benefited from a different vehicle allocation system, and even if it could have sold additional vehicles had GM allocated them, Beck provides no evidence suggesting that GM's system for allocating vehicles was unreasonable or unfair. To the contrary, GM employed an equitable allocation system based on past performance. When it became clear that the system was inadequate for dealers who had entered Wind-Down Agreements before signing Participation Agreements, GM modified the system to offer additional inventory. Beck refused the vast majority of what GM offered, including 146 of the vehicles offered in January 2011. Nevertheless, it ordered 151 vehicles beyond GM's allocation in the following two months. GM's refusal to deliver to Beck exactly the number of vehicles it asked for in the month it asked for them does not constitute a failure to deliver a "reasonable quantity [of vehicles] [] within a reasonable time." N.Y. Veh. & Traf. Law § 463(2)(a).

**V.    Attorney's Fees**

Beck also asserts that it is entitled to attorney's fees on two claims dismissed by the district court, arguing that it was the "prevailing party" as to those claims because GM voluntarily abandoned the policies that Beck had challenged. Although attorney's fees frequently are statutorily limited to

prevailing parties, *see, e.g.*, 42 U.S.C. § 12205 ("In any action or administrative proceeding commenced pursuant to this chapter, the court or agency, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee."); 17 U.S.C. § 505 ("Except as otherwise provided by this title, the court may also award a reasonable attorney's fee to the prevailing party as part of the costs."), a party need not qualify as a "prevailing party" in order to receive a fee award under the Dealer Act.

The Dealer Act provides that "the court may award necessary costs and disbursements plus a reasonable attorney's fee to any party." N.Y. Veh. & Traf. Law § 469(1). The district court declined to grant attorney's fees to either party both because the "[p]laintiff [wa]s the losing party and because an award of attorneys' fees would not be appropriate . . . given the good faith nature of the claims and defenses. . . ." Order at 2 (Sept. 25, 2013) (Special App'x 91). We review a district court's fee determination for abuse of discretion. *McDaniel v. Cnty. of Schenectady*, 595 F.3d 411, 416 (2d Cir. 2010).

Setting aside the question whether Beck was required to be the prevailing party in order to qualify for an attorney's fee award, the district court did not abuse its discretion in denying Beck's fee request. The court's denial of fees was

not based on "an erroneous view of the law or on a clearly erroneous assessment of the evidence." *In re Sims*, 534 F.3d 117, 132 (2d Cir. 2008) (internal quotation marks omitted). On the contrary, its decision to deny fees because of the "good faith nature of the claims and defenses," Order at 2 (Sept. 25, 2013) (Special App'x 91), was "located within the range of permissible decisions," particularly in light of section 469's permissive language, *Sims*, 534 F.3d at 132 (internal quotation marks omitted).

## VI.    GM's Counterclaim for Rescission

GM appeals from the district court's dismissal of its counterclaim for rescission of the Participation Agreement as moot. The crux of GM's counterclaim is that Beck failed to meet the state average RSI – an essential element of the Participation Agreement. Having dismissed Beck's claims against GM and apparently believing that the dismissal would be dispositive of the related termination proceeding in the Motor Vehicle Department, the district court determined that GM no longer had any need to bring suit for rescission. But in light of the Motor Vehicle Department's ruling against GM in its effort to terminate the franchise, we do not think that GM's counterclaim for rescission is moot. We nonetheless affirm the district court's dismissal, albeit on a different basis.

Rescission is an equitable remedy, the use of which is generally left to the courts' discretion. But that discretion may be displaced by "clear and valid legislative command." *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 496 (2001). In other words, where the legislature has clearly expressed its intent to cabin a court's discretion to fashion equitable remedies, the court must respect those limitations. Such is the case here. Section 463(2)(d)-(e) of the New York Vehicle and Traffic Law expressly requires due cause, notice, and an opportunity to cure before the franchisor may terminate the franchise. N.Y. Veh. & Traf. Law § 463(2)(d)-(e). "Terminate" is defined to include "rescission." *Id.* § 462(17). As a result, we would only be empowered to grant rescission to GM if it had first demonstrated due cause for rescission and provided Beck with both notice and the opportunity to cure. GM failed to satisfy those prerequisites, and we therefore affirm the district court's dismissal of this claim.

### VII. Evidentiary Issues

Finally, Beck and GM each challenge several of the district court's evidentiary rulings. We review evidentiary rulings for abuse of discretion. *Ret. Plan of UNITE HERE Nat'l Ret. Fund v. Kombassan Holdings A.S.*, 629 F.3d 282, 287 (2d Cir. 2010). We will grant a new trial "if the district court committed errors that were a clear abuse of discretion that were clearly prejudicial to the outcome

of the trial," measuring prejudice "by assessing the error in light of the record as a whole." *Marshall v. Randall*, 719 F.3d 113, 116 (2d Cir. 2013) (internal quotation marks omitted). We address each of the parties' challenges briefly, concluding that none has merit.

First, Beck challenges the district court's exclusion of a portion of an expert witness report comparing the number of non-GM competitor dealerships in upstate New York and downstate New York. Beck sought to use the report to cross-examine GM's witness about whether GM should consider inter-brand competition in designing performance metrics. But even assuming that the district court erred in excluding the expert report, Beck suffered no prejudice. *See United States v. Gupta*, 747 F.3d 111, 133-34 (2d Cir. 2014) (setting forth several factors that are to be considered by a reviewing court in determining whether any error was harmless, including the "importance of . . . unrebutted assertions," duplication of evidence, and the strength of the opposing party's evidence on that point (alteration in original)). Counsel for Beck questioned GM's expert at length about the same topic addressed in the report. The expert responded that RSI should not be adjusted by regional differences in inter-brand competition, and that existing segmentation captures those disparities. Beck was thus able to

elicit the same testimony without the report that it would have been able to with it, making introduction of the report duplicative and unnecessary to rebut GM's case.

Second, Beck challenges the district court's exclusion of a document reflecting the amount of advertising money spent nationwide and in New York City, which purportedly would show that GM spent less on advertising in the New York City area in 2010 and 2011 than in 2009 and 2012.  The district court properly excluded the report both because Beck sought to use it to cross-examine GM's expert witness, Sharif Farhat, on a topic that was beyond the scope of his direct examination, *see* Fed. R. Evid. 611(b); *United States v. Koskerides*, 877 F.2d 1129, 1136 (2d Cir. 1989), and any comparison that did not include relative spending upstate and downstate was minimally useful, at best, *see* Fed. R. Evid. 401, 403.  The possible explanations for Beck's poor performance in 2010 and 2011 are not at issue in this case.  The question is whether it was and is reasonable for GM to compare Beck's performance to the performance of upstate dealers.  While evidence that GM spent less on advertising in the New York City area relative to what it spent upstate might enhance Beck's argument, then, evidence that GM

41

spent less on advertising in New York City in 2010 and 2011 relative to 2009 and 2012, or even relative to the rest of the country, does not.

Third, the district court did not err in foreclosing Beck's attempt to cross-examine GM's expert on whether GM's exit from the market for leasing vehicles to drivers could have adversely impacted downstate dealers.  The expert had not testified about leasing on direct examination, and he testified on cross-examination that leasing did not have an impact on RSI calculations and that he was unaware of any bearing it may have had on Beck's situation.  The district court plainly acted within its discretion in curtailing this line of questioning under Rule 611, which instructs that "[c]ross-examination should not go beyond the subject matter of the direct examination and matters affecting the witness's credibility."  Fed. R. Evid. 611(b); *see also Koskerides*, 877 F.2d at 1136.

Finally, GM challenges the district court's exclusion of evidence that Beck's own operational decisions were at fault for its poor performance.  As noted, this evidence would not have been relevant to the question whether GM employed an "unreasonable, arbitrary or unfair sales or other performance standard," N.Y. Veh. & Traf. Law § 463(2)(gg), and was therefore properly excluded.  *See* Fed. R. Evid. 401, 403.  To the extent that GM's performance standard is unreasonable, it

is so because it compares dealerships whose sales are influenced by distinct market factors. That Beck could have made certain operational changes is not relevant.

## **CONCLUSION**

For the foregoing reasons, we AFFIRM the district court's judgment in part and CERTIFY the remaining questions to the New York Court of Appeals.

## **Certification**

In this Circuit, "[i]f state law permits, the court may certify a question of state law to that state's highest court." 2d Cir. R. 27.2(a). The New York state law permitting certification is N.Y. Comp. Codes R. & Regs. tit. 22, § 500.27(a), which provides, "Whenever it appears to . . . any United States Court of Appeals . . . that determinative questions of New York law are involved in a case pending before that court for which no controlling precedent of the [New York] Court of Appeals exists, the court may certify the dispositive questions of law to the Court of Appeals." We have discretion to certify questions to the New York Court of Appeals even where, as here, the parties have not requested certification. *See Licci*, 673 F.3d at 74.

Several factors guide our decision to exercise this discretion. "First, and most important, certification may be appropriate if the New York Court of Appeals has not squarely addressed an issue and other decisions by New York courts are insufficient to predict how the Court of Appeals would resolve it." *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 42 (2d Cir. 2010). "Second, the question on which we certify must be of importance to the state, and its resolution must require [] value judgments and important public policy choices that the New York Court of Appeals is better situated than we to make." *Licci*, 673 F.3d at 74 (citations and internal quotation marks omitted; brackets in original). Finally, certification is appropriate if the question or questions are "determinative of a claim before us." *Id.* (internal quotation marks omitted).

None of the provisions of the New York Dealer Act implicated in this case has been addressed by the New York Court of Appeals or, at any length or depth, by another state court. The disposition of this case could have a substantial impact not only on the relationship between General Motors and its franchisees, but also on other franchisor/franchisee relationships in New York State. And GM's performance metrics are industry standard. A ruling that the standard violates the New York Dealer Act could therefore result in statewide—

or perhaps even broader—challenges and changes.  And deciding these issues would require us to determine the level of judicial intervention in the franchisor/franchisee relationship that the New York Legislature intended.  Such a determination implicates significant policy issues and is, we think, best decided by state courts.

We accordingly certify the following two questions to the New York Court of Appeals:

(1) Is a performance standard that requires "average" performance based on statewide sales data in order for an automobile dealer to retain its dealership "unreasonable, arbitrary, or unfair" under New York Vehicle & Traffic Law section 463(2)(gg) because it does not account for local variations beyond adjusting for the local popularity of general vehicle types?

(2) Does a change to a franchisee's Area of Primary Responsibility or AGSSA constitute a prohibited "modification" to the franchise under section 463(2)(ff), even though the standard terms of the Dealer Agreement reserve the franchisor's right to alter the Area of Primary Responsibility or AGSSA in its sole discretion?

"As is our practice, we do not intend to limit the scope of the Court of Appeals' analysis through the formulation of our questions, and we invite the Court of Appeals to expand upon or alter these questions as it should deem appropriate." *Licci*, 673 F.3d at 75 (internal quotation marks and brackets omitted).

45

It is hereby ORDERED that the Clerk of this Court transmit to the Clerk of the New York Court of Appeals this opinion as our certificate, together with a complete set of the briefs, the appendix, and the record filed in this Court by the parties. The parties shall bear equally any fees and costs that may be imposed by the New York Court of Appeals in connection with this certification. This panel will resume its consideration of this appeal after the disposition of this certification by the New York Court of Appeals.